**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

BETTER MARKETS, INC.
1825 K Street, N.W., Suite 1080
Washington, D.C.  20006

Plaintiff,

v.

UNITED STATES DEPARTMENT
OF JUSTICE and ERIC H. HOLDER, JR.,
in his official capacity as Attorney
General of the United States,
950 Pennsylvania Avenue, N.W.
Washington, D.C.  20530-0001

Defendants.

Civil Action No.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

### I.      INTRODUCTION AND SUMMARY

1.      This is an action under the Constitution of the United States, the Administrative Procedure Act ("APA"), and the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), against the United States Department of Justice and the Attorney General of the United States, Eric H. Holder, Jr. (together, "DOJ"), challenging the validity of the historic and unprecedented $13 billion contractual agreement between the DOJ and JPMorgan Chase & Co. ("JP Morgan Chase") that was announced on November 19, 2013 but never reviewed or approved by any court ("$13 Billion Agreement").

2.      The $13 Billion Agreement is a mere contract whereby JP Morgan Chase agreed to pay $13 billion in exchange for complete civil immunity from DOJ for years of pervasive,

egregious, and knowing alleged fraud and other illegal conduct related to the worst financial crash in the U.S. since 1929, which caused the worst economy in the U.S. since the Great Depression ("Financial Crisis").  The Financial Crisis is estimated to cost the U.S. between $13 trillion and $38 trillion (which would be as much as $120,000 for every man, woman and child in the country).

3.      As the DOJ admitted, JP Morgan Chase's illegal conduct in making "serious misrepresentations to the public" and "knowingly bundl[ing] toxic loans and sell[ing] them to unsuspecting investors" had a "staggering" impact, "helped sow the seeds of the mortgage meltdown," and "contributed to the wreckage of the" Financial Crisis.

4.      The DOJ has also admitted that this contract for $13 billion and civil immunity is "record breaking" and the "largest settlement with a single entity in American history."  In fact, it is more than 300% larger than the next largest settlement with a single entity that the DOJ has ever entered into, which was for only $4 billion.

5.      In addition, of the $13 billion, the DOJ imposed a $2 billion penalty, which the DOJ admitted was "the largest FIRREA penalty in history."  That is actually a gross understatement because the next largest FIRREA penalty assessed in at least the last five years appears to have been a mere $15.5 million.  Thus, the FIRREA penalty the DOJ imposed on JP Morgan Chase here by contract was 12,000% larger than that next largest penalty.

6.      Yet, this contract was the product of negotiations conducted entirely in secret behind closed doors, in significant part by the Attorney General personally, who directly negotiated with the CEO of JP Morgan Chase, the bank's "chief negotiator."  No one other than those involved in those secret negotiations has any idea what JP Morgan Chase really did or got for its $13 billion because there was no judicial review or proceeding at all regarding this historic

and unprecedented settlement.  However, it is known that JP Morgan Chase's $13 billion did result in almost complete nondisclosure by the DOJ regarding JP Morgan Chase's massive alleged illegal conduct.

7.      Thus, the Executive Branch, through DOJ, acted as investigator, prosecutor, judge, jury, sentencer, and collector, without any review or approval of its unilateral and largely secret actions.  The DOJ assumed this all-encompassing role even though the settlement amount is the largest with a single entity in the 237 year history of the United States and even though it provides civil immunity for years of illegal conduct by a private entity related to an historic financial crash that has cause economic wreckage affecting virtually every single American.  The Executive Branch simply does not have the unilateral power or authority to do so by entering a mere contract with the private entity without any constitutional checks and balances.

8.      Notwithstanding such extensive and historic illegal conduct that resulted in a $13 billion payment, the DOJ did not disclose the identity of a single JP Morgan Chase executive, officer, or employee, no matter how involved in or responsible for the illegal conduct.  In fact, the DOJ did not even disclose the number of executives, officers, or employees involved in the illegal conduct or if any of them are still executives, officers, or employees of JP Morgan Chase today.  Moreover, the DOJ did not disclose the material details of what these individuals did, when or how they did it, or to whom and with what consequences.  The DOJ was even silent as to which specific laws were violated, to what degree, and by what conduct.  The DOJ also did not disclose even an estimate of the amount of damage JP Morgan Chase's years of illegal conduct caused or how much money it made or how much money its clients, customers, counterparties, and investors lost.  Remarkably, the DOJ does not even clearly state the period for which it is granting JP Morgan Chase immunity: The $13 Billion Agreement states that the

investigation spanned the period between 2005 and 2008; another document refers to JP Morgan Chase's illegal conduct between 2005 and 2007; and the DOJ press release references actions in connection with the listed RMBS issued "prior to January 1, 2009."

9.      Thus, these and many other critical facts remain unknown and undisclosed in the substantively uninformative settlement agreement; the brief and misleadingly-labeled document entitled "Statement of Facts" ("SOF"), which was clearly drafted by the DOJ and JP Morgan Chase to conceal rather than reveal; or the press release issued by DOJ to trumpet the $13 Billion Agreement ("Press Release").

10.      As a result, no one has any ability to determine if the $13 Billion Agreement is fair, adequate, reasonable, and in the public interest or if it is a sweetheart deal entered into behind closed doors that, by design, intent, or effect, let the biggest, most powerful, and well-connected bank in the U.S. off cheaply and quietly for massive illegal conduct that contributed to the Financial Crisis and the economic disaster it caused.  Indeed, one could argue that the $13 billion payment was for making sure no one ever learns the scope and detail of JP Morgan Chase's illegal conduct.

11.      For example, did JP Morgan Chase settle liability for $100 billion, $200 billion, or more for just $13 billion?  Did JP Morgan Chase make $20 billion, $40 billion, or more from its illegal conduct?  Should JP Morgan Chase have disgorged $20 billion, $40 billion, or more in ill-gotten gains?  Are the same executives, officers, and employees involved in the settled illegal conduct in the same or similar positions of trust and responsibility today, and if so, what measures have been taken to ensure their illegal conduct is not repeated?

12.      In addition, why is the $13 billion the only sanction against JP Morgan Chase? Although requiring changes in the way an institution conducts business are typical (if not

standard) measures when settling much smaller, less consequential matters, DOJ did not require JP Morgan Chase to undertake remedial measures of any type to ensure that the illegal conduct at issue or similar illegal activities are not repeated in the future.   Similarly, the $13 Billion Agreement provides for no injunction against JP Morgan Chase, yet injunctions are standard features of settlements in matters much less grave and historic than this one.

13.     Given all those undisclosed facts and the shroud of secrecy in which the DOJ and JP Morgan Chase have cloaked the $13 Billion Agreement, the public could well perceive it as an effort by the DOJ to keep JP Morgan Chase's illegal conduct nonpublic so that the agreement between DOJ and JP Morgan Chase could never be independently scrutinized or evaluated. Would that perception have a factual basis?  No one knows, and without review and assessment by a court, no one will ever know because transparency, accountability, and oversight were all sacrificed in this settlement and in the settlement process.

14.     The imperative for judicial review is all the more important here because the DOJ and the Attorney General have an apparent conflict of interest, if not a motive to accept a seemingly strong but actually weak and inadequate settlement that could not pass judicial scrutiny:   The $13 Billion Agreement follows years of sustained, intense, and high profile criticism of the DOJ and the Attorney General personally for failing to hold Wall Street's biggest and most powerful institutions like JP Morgan Chase accountable for their central role in causing or contributing to the Financial Crisis.   Indeed, they have been accused of creating a double standard of justice in the U.S.:  one for Wall Street and one for Main Street.

15.     The Attorney General's testimony before the U.S. Senate confirmed that there is indeed a double standard because he and the DOJ take into account the possible systemic implications of Wall Street's biggest banks before deciding whether to charge or punish them.

As a result, the too-big-to-fail Wall Street banks get a break while others too-small-to-care-about get punished.  The testimony of the Attorney General caused an immediate furor and he has tried to walk back his statement.  However, as chronicled by 60 Minutes, Frontline, and much of the media, a dark cloud has hung over the DOJ and the Attorney General since his testimony.

16.     The DOJ and the Attorney General have aggressively used the $13 Billion Agreement to try to restore their reputations and rebut these charges.  For example, the DOJ proclaimed that the "settlement represents another significant step towards holding accountable those banks which exploited the residential mortgage market and harmed numerous individuals and entities in the process."  The Attorney General himself said "[t]he size and scope of this resolution should send a clear signal that the Justice Department's financial fraud investigations are far from over.  No firm, no matter how profitable, is above the law, and the passage of time is no shield from accountability."

17.     Thus, the DOJ and the Attorney General have a vested interest in proclaiming this settlement tough on Wall Street and it would be devastating to them if it were not perceived that way.  Structuring the agreement so that there would be no judicial review ensured that there would be no independent check on their claims.  The DOJ avoided oversight and accountability.  Furthermore, the total lack of transparency and meaningful information regarding what JP Morgan Chase did, how they did it, how much they profited, how much clients lost, of course, ensures that no one will ever be in a position to challenge their self-serving assertions.  One might think that was the point of secretly negotiating the agreement and drafting it to reveal as little as possible.

18.     Demonstrating the DOJ's fervent self-interest in promoting the story line that it was finally getting tough on Wall Street, it misrepresented or, at best, exaggerated the terms of

the settlement as being more severe than they were.  As detailed below, DOJ claimed that it got JP Morgan Chase to acknowledge making "serious misrepresentations to the public," but JP Morgan Chase quickly and directly contradicted the DOJ, stating that it made no such acknowledgment.

19.     In addition, high level political appointees of the DOJ, including the Attorney General personally, led the secret negotiations and the eleventh-hour discussions that resulted in the $13 Billion Agreement.  In fact, at a critical juncture, with the DOJ just hours away from filing a lawsuit, JP Morgan Chase's CEO directly and personally called the cellphone of the third highest ranking official at the DOJ, who reportedly "recognized" the incoming phone number of the CEO, who then offered billions of dollars more to prevent the filing of the lawsuit.  This very well-timed call to the DOJ official's cellphone was successful:  The DOJ called off the filing of the lawsuit later that day; face-to-face negotiations between the Attorney General and the CEO commenced a day later; JP Morgan Chase began offering billions of dollars more to prevent the filing of any lawsuit; and the $13 Billion Agreement was reached and finalized, ensuring that no lawsuit would be filed and no meaningful disclosure of JP Morgan Chase's vast illegal conduct would ever occur.

20.     The heavy and decisive involvement of such high level political appointees at the DOJ is particularly important given the status, connectedness, and political activities not just of JP Morgan Chase, but also its very high profile CEO.  As was widely reported, JP Morgan Chase's CEO was considered for nomination as the President's Treasury Secretary just a few short years ago.  He was, thus, a potential fellow cabinet officer of the Attorney General. Although never elevated to Treasury Secretary, JP Morgan Chase's CEO is still a welcome guest at the highest levels of the Administration, including at the White House.

21.     While such actions, agreements, and settlements might be permissible under other circumstances, the DOJ does not have the unilateral authority to, by contract and without any judicial review or approval, (a) finalize what it admitted is "the largest settlement with a single entity in American history," with the largest bank in the U.S., regarding an historic financial crash that has inflicted widespread economic wreckage across the U.S.; (b) obtain an unprecedented $13 billion monetary payment, including an historic $2 billion penalty; (c) tell the American public almost nothing about what was involved; (d) provide blanket immunity to the bank; and then, (e) as the DOJ has stated, use it as a template for future contractual settlements with the other largest too-big-to-fail Wall Street institutions for their role in causing or contributing to the Financial Crisis.

22.     The DOJ and the Attorney General have used the settlement amount of $13 billion as a sword and a shield to deflect questions and blind people to the utter lack of meaningful information about their unilateral action and JP Morgan Chase's illegal conduct. However, a record-breaking settlement amount does not make an agreement right, adequate, or legal.  A dollar amount, no matter how large, cannot substitute for transparency, accountability, oversight, or a government that operates in the open, not behind closed doors.  Such actions, however well-meaning or motivated they might be, will erode public confidence in government officials and, indeed, government itself.  Thus, even an unprecedented settlement amount cannot blind justice or immunize the DOJ from having to obtain independent judicial review of its otherwise unilateral, secret actions regarding such historic events.

23.     Under these facts and circumstances, the DOJ's decision not to seek and obtain judicial review and approval of the $13 Billion Agreement is a violation of the separation of powers doctrine; the APA; and the explicit requirements of FIRREA, 12 U.S.C. § 1833a.  It was

incumbent on the DOJ to file a lawsuit in a federal court and submit the $13 Billion Agreement to that court so it could perform its constitutionally assigned review function.  The facts and circumstances in this case demonstrate why constitutional checks and balances are so vitally important.

24.     As set forth in detail below, the DOJ's failure to obtain the required judicial review of the $13 Billion Agreement has injured and continues to injure Plaintiff Better Markets, Inc. ("Better Markets") by undermining its mission objectives; by interfering with its ability to pursue its advocacy activities; by forcing it to devote resources to identifying and counteracting the harmful effects of the DOJ's unlawful settlement process; by depriving Better Markets of the information to which it would have been entitled had the DOJ sought judicial review and approval of the $13 Billion Agreement; and by depriving Better Markets of a judicial forum in which it could seek to participate to influence the settlement process before the agreement becomes effective.

25.     To remedy the defects in the $13 Billion Settlement and in the settlement process, and as set forth in more detail in the Prayer for Relief, Better Markets seeks a judgment declaring that:

a.      the DOJ violated the separation of powers doctrine by unilaterally finalizing the $13 Billion Agreement without seeking judicial review and approval;

b.      the DOJ acted in excess of its statutory authority by unilaterally finalizing the $13 Billion Agreement without seeking judicial review and approval;

c.      the DOJ acted arbitrarily and capriciously by unilaterally finalizing the $13 Billion Agreement without seeking judicial review and approval;

     d.    the DOJ failed to comply with the explicit requirements of FIRREA, 18 U.S.C. § 1833a(a) and (e), when it assessed and extracted a $2 billion civil monetary penalty from JP Morgan Chase without having a court assess that penalty;

     e.    the DOJ failed to comply with the explicit requirements of the APA, 5 U.S.C. § 558, when it extracted monetary sanctions from JP Morgan Chase without being authorized by law to do so; and

     f.    the $13 Billion Agreement is unlawful and invalid, in whole or in part.

26.    Better Markets further seeks an injunction preventing the DOJ from enforcing the $13 Billion Agreement unless and until the DOJ submits the $13 Billion Agreement to a court with an ample and detailed record so that such court may review all the facts and circumstances, enlarge the record supporting the $13 Billion Agreement as it deems necessary, and determine whether the $13 Billion Agreement meets the applicable standard of review.

## II.    PARTIES

### Defendants

27.    Defendant Department of Justice is an agency of the United States Government, and it is subject to the APA.  *See* 5 U.S.C. §§ 551(1), 703; 28 U.S.C. § 501.

28.    Defendant Eric H. Holder ("Attorney General") is the Attorney General of the United States.  The Attorney General has ultimate authority over the DOJ and is responsible for overseeing the DOJ's compliance with, among other statutes, FIRREA in its enforcement actions.  *See* 5 U.S.C. § 703.

### Plaintiff

29.    Plaintiff Better Markets is a 501(c)(3) tax-exempt nonprofit organization incorporated in Georgia with its principal place of business in Washington, D.C.  It was founded

in 2010 to promote the public interest in the financial markets.  It advocates for greater transparency, accountability, and oversight in the financial system through a variety of activities, including, without limitation, the following:

    a.    commenting on rules proposed by the financial regulators;

    b.    engaging in public advocacy through the print, broadcast, and social media;

    c.    issuing press releases, press statements, and newsletters;

    d.    testifying before congressional committees;

    e.    hosting or participating in federal agency roundtables and other public events;

    f.    conducting and publishing independent research; and

    g.    participating in litigation.

30.    One goal of Better Markets to ensure that the rules promulgated in accordance with the Dodd-Frank Wall Street Reform and Consumer Protection Act ("2010 Financial Reform Law") by the financial regulatory agencies are sufficiently strong and comprehensive to end the inappropriate, reckless, and fraudulent practices that caused the Financial Crisis and that will inevitably lead to another crisis absent strong regulatory reform, among other things.

31.    Accordingly, Better Markets devotes many of its resources to commenting on, and in some cases defending in court, the vast collection of rules being proposed and adopted by the financial regulators to implement the 2010 Financial Reform Law.  For example, and without limitation, Better Markets has engaged in the following activities:

    a.    Better Markets has submitted over 150 letters, including formal comment letters, to the financial regulatory agencies on rules being promulgated in the areas of

securities, commodities, and banking regulation. The depth and breadth of Better Markets' activities here are unique; no other non-industry group has engaged on the issue of financial reform at this level. In those submissions, Better Markets has advocated for the imposition of strong, clear, and enforceable regulatory standards that will promote transparency, accountability, and oversight in the financial markets and that will eliminate or minimize the threat of another Financial Crisis.

b.  Better Markets has had over 75 meetings with U.S. federal regulators, attended by agency heads or senior staff members of those regulators, to highlight areas where rules must be strengthened.

c.  Better Markets has conducted extensive research into a variety of topics relating to financial reform, ranging from excessive speculation in the commodities markets to the use of so-called cost-benefit analysis by opponents of reform challenging rules promulgated in accordance with the 2010 Financial Reform Law.

d.  Better Markets has appeared in eight cases in federal court as *amicus curiae* to defend agency rules against industry allegations that the agencies failed to conduct adequate economic analysis or violated the APA when they promulgated their financial reform rules. *Natl Assoc. of Manufacturers v. SEC*, No. 13-cv-5252 (D.C. Cir. filed Aug. 13, 2013); *Inv. Co. Inst. v. CFTC*, 720 F.3d 370 (D.C. Cir. 2013); *Natl Assoc. of Manufacturers v. SEC*, No. 1:13-cv-635 (D.D.C. July 23, 2013); *American Petroleum Inst. v. SEC,* No. 12-cv-1668 (D.D.C. July 2, 2013); *Natl Assoc. of Manufacturers v. SEC*, No. 12-1422 (D.C. Cir. May 2, 2013); *American Petroleum Inst. v. SEC,* No. 12-1398 (D.C. Cir. Apr. 16, 2013); *Inv. Co. Inst. v. CFTC*, No . 1:12-cv-612 (D.D.C. Dec. 12, 2012); *Int'l Swaps and Derivatives Ass'n v. CFTC*, 887 F. Supp. 2d 259 (D.D.C.

2012).  Better Markets is the only organization to consistently assist federal agencies in defending against such industry rule challenges in court.

32.     Better Markets also recognizes that effective financial regulation and reform, and the prevention of another Financial Crisis, depends not only on the enactment of strong laws and the promulgation of strong rules, but also on the effective enforcement of those laws and rules. Accordingly, another goal of Better Markets is to promote strong enforcement under the laws and regulations governing financial markets and institutions.  To further that mission, Better Markets urges federal agencies to include robust enforcement mechanisms in their reform rules; meets with agency heads and senior enforcement officials at federal agencies to encourage aggressive, transparent, and effective enforcement of financial regulations; and argues in court as an *amicus curiae* for the imposition of monetary penalties and other sanctions that are sufficient to effectively deter and punish illegal conduct in the financial sector.

33.     A specific focus of Better Markets' advocacy is on the settlement of enforcement actions by financial regulators, because almost all of those enforcement actions are resolved through the settlement process.  Better Markets devotes significant resources to evaluating settlement agreements in government enforcement actions and advocating for settlements that are open and transparent; based on a sufficiently detailed record; and sufficiently strong to effectively punish and deter unlawful conduct in the financial markets.

34.      Better Markets further advocates that judicial review of settlements in federal agency enforcement action is a vitally important part of the process—

      a.     whenever the parties themselves enlist the power of a federal court to approve and enforce a settlement; or

b.      whenever, as in this case, the resolution of the matter will have a profound, historic, and unprecedented impact on the public interest.

35.    Better Markets promotes strong settlements through a variety of activities, including, without limitation, the following:

a.      Better Markets holds meetings with federal agency heads and senior level agency staff, urging the agencies to pursue stronger settlement terms in enforcement actions and to create a more complete and transparent record in the settlement process.

b.      Better Markets challenges settlements in enforcement actions in federal court when they are based upon an inadequate factual record; they lack sufficient explanation or justification; they are not subjected to a meaningful judicial review according to the applicable legal standard; or they are facially weak and incapable of punishing or deterring unlawful conduct.  *See, e.g.,* Brief of Better Markets, Inc. as *Amicus Curiae* filed in *SEC v. Citigroup Global Mkts. Inc.*, No. 11-cv-5227 (2d Cir. Dec. 20, 2011).

c.      Better Markets publicly urges regulators and enforcement authorities to ensure that their settlements are transparent and based on a record that enables the public, and where appropriate a court, to understand and evaluate the agreements.  For example, in anticipation of the $13 Billion Agreement in this case, Better Markets submitted a letter to the DOJ, advocating for transparency in any forthcoming settlement and urging that "any settlement with JP Morgan Chase provide full, comprehensive, and detailed public disclosure regarding all matters settled, including the facts related to each matter, the damages and harm caused, the ill-gotten gains received, the executives involved, and the other specific terms relating to each matter."  *See* Letter from Better Markets to

14

Attorney General Holder, Re: JP Morgan Chase, Agreement Negotiations & Final Agreement (Nov. 6, 2013), *available at* http://bettermarkets.com/sites/default/files/Better%20Markets%20Letter%20to%20AG%20Holder-%20JPM%20Agreement-%2011-6-13.pdf.  The letter further argued that "any failure to fully explain, justify, and detail all aspects of any settlement will be inexcusable," as "it will confirm suspicions that the settlement is in fact a carefully choreographed charade, devised behind closed doors primarily to satisfy the interests of the bank and the Department [of Justice], not the public." *Id*. at 3.

    d.    Better Markets engages in significant public education and advocacy through the media regarding the importance of settlements and the settlement process. For example, in anticipation of the $13 Billion Agreement in this case, and acting through media channels, Better Markets (1) highlighted the need for transparency in the settlement process, so that the public could judge the adequacy of the $13 Billion Agreement for itself; (2) questioned whether the DOJ was giving JP Morgan Chase special treatment in the settlement process; and (3) argued that, notwithstanding the reportedly large $13 billion settlement amount, the $13 Billion Agreement may not serve as an effective punishment or deterrent given the nature of the reported monetary sanctions, the anticipated failure to hold responsible individuals accountable, and the egregious and widespread misconduct involved.

36.    Better Markets is a "person" within the meaning of the APA, 5 U.S.C. §§ 551(2), 702.

### III.   JURISDICTION AND VENUE

37.     This action arises under the United States Constitution; the APA, 5 U.S.C. §§ 500 *et seq.*; and FIRREA, 12 U.S.C. § 1833a.   Jurisdiction therefore lies in this Court under 28 U.S.C. § 1331.

38.     Venue is proper in this Court under 28 U.S.C. § 1391(e) because this is an action brought by a plaintiff that resides in this judicial district, against an agency of the United States and an officer of that agency acting in his official capacity or under color of legal authority that reside in this judicial district, and a substantial part of the events or omissions giving rise to this action occurred in this judicial district.

39.     The actions and failures to act of the DOJ complained of herein, including, without limitation, the $13 Billion Agreement, constitute "agency action" within the meaning of the APA, 5 U.S.C. §§ 551(13), 702, 704, 706.

40.      The actions and failures to act of the DOJ complained of herein, including, without limitation, the $13 Billion Agreement, constitute final agency action for which there is no other adequate remedy in court, all within the meaning of the APA, 5 U.S.C. § 704.

41.     As a result of the actions and failures to act of the DOJ complained of herein, including, without limitation, the $13 Billion Agreement, Better Markets is suffering legal wrong and is adversely affected or aggrieved by agency action, all within the meaning of the APA, 5 U.S.C. § 702.

42.     As a result of the actions and failures to act of the DOJ complained of herein, including, without limitation, the $13 Billion Agreement, Better Markets is entitled to judicial review.

43.     As detailed more fully above and below, Plaintiff Better Markets has standing to bring this action because the DOJ's violations of the Constitution, the APA, and FIRREA have injured and continue to injure Better Markets by undermining its mission objectives; by interfering with its ability to pursue its advocacy activities; by forcing it to devote resources to counteracting the harmful effects of the DOJ's unlawful settlement process; by depriving Better Markets of the information to which it would have been entitled had the DOJ sought judicial review and approval of the $13 Billion Agreement; and by depriving Better Markets of a judicial forum in which it could seek to participate to influence the settlement process before the agreement becomes effective.

44.     All of the foregoing injuries to Better Markets have been caused by the unlawful activities of the DOJ in entering the $13 Billion Agreement without any judicial oversight, and all of those injuries will be redressed if the relief requested herein is granted.

45.     Finally, the interests of Better Markets are consistent with the purposes of the constitutional and statutory provisions at issue.  Indeed, the efforts of Better Markets in this case will further, rather than frustrate, the policies and objectives underlying the constitutional and statutory provisions at issue, including the separation of powers doctrine, FIRREA, and Section 558 of the APA, 5 U.S.C. § 558.

## IV.     FACTS

46.     The DOJ entered into the $13 Billion Agreement with JP Morgan Chase on November 19, 2013.[1]

---

[1] The $13 Billion Agreement and related material from the DOJ that are referred to in this Complaint are available on the DOJ's website, http://www.justice.gov/opa/pr/2013/November/13-ag-1237.html.

47.     This $13 Billion Agreement between the DOJ and JP Morgan Chase was unprecedented and historic in many ways, including the following:

a.      It was "the largest settlement [amount] with a single entity in American history," as the DOJ admitted.  Press Release.  In fact, it was more than 300% larger than the next largest settlement amount with a single entity, which was just $4 billion.

b.      It included "the largest FIRREA penalty in history," as the DOJ also admitted;

c.      It related to the largest financial crash in the U.S. since the Great Crash of 1929 and the worst economy in the U.S. since the Great Depression of the 1930s.

d.      It was with the largest, richest, and most well-connected bank in the United States and the world, JP Morgan Chase.

e.      It was negotiated between senior political appointees at the DOJ including the Attorney General personally and the CEO of JP Morgan Chase.

f.      It resulted from a phone call from JP Morgan Chase's CEO directly and personally to the cellphone of the third highest ranking official at the DOJ, who tellingly "recognized" the incoming phone number of the CEO.

g.      It resulted from JP Morgan Chase's CEO personally offering the DOJ billions of dollars more to prevent the imminent filing of a lawsuit and to prevent the public disclosure of JP Morgan Chase's illegal conduct.

h.      It stopped the DOJ from filing a lawsuit detailing JP Morgan Chase's illegal conduct, which the DOJ had drafted and had been planning to file just hours after the phone call was placed.

i.      It gave blanket civil immunity to JP Morgan Chase for all of its illegal conduct over some number of years related to its creation, packaging, marketing, sale, issuance, and distribution of toxic subprime mortgages.

j.      It related to massive and pervasive illegal conduct by JP Morgan Chase that lead up to and contributed to the Financial Crisis, which caused and continues to cause economic wreckage across the United States and which will likely cost more than $13 trillion and possibly as much as $120,000 for every man, woman, and child.

k.      It disclosed very few meaningful facts related to this illegal conduct to the public.

l.      It is going to be a template for the DOJ's settlements with the other handful of gigantic, too big, too complex, and too-interconnected-to-fail Wall Street banks.

48.     The $13 Billion Agreement has three principal components.

a.      First, it fully, finally, and forever resolves unspecified "potential legal claims" for unspecified violations of federal civil laws in connection with the creation, packaging, marketing, sale, issuance, and distribution of residential mortgage-backed securities ("Subprime Securities") by JP Morgan Chase and two companies it purchased (The Bear Stearns Companies ("Bear Stearns") and Washington Mutual Bank ("Washington Mutual")) over the four-year period from 2005 to 2008.

b.      Second, it fully, finally, and forever resolves unspecified "potential legal claims" of four states (California, Delaware, Illinois, and Massachusetts) for unspecified violations of state law in connection with the creation, packaging, marketing, sale,

issuance, and distribution of Subprime Securities.  Those four states are parties to the $13 Billion Agreement.

       c.      Finally, the $13 Billion Agreement memorializes the separate disposition of claims made in 20 civil lawsuits previously filed by the Federal Deposit Insurance Corporation ("FDIC"), the Federal Housing Finance Agency ("FHFA"), the National Credit Union Association Board ("NCUA"), and the State of New York, against JP Morgan Chase and other defendants in various federal and state courts, also relating to the creation, packaging, marketing, sale, issuance, and distribution of Subprime Securities ("Related Actions").  The FDIC, FHFA, NCUA, and the State of New York are not parties to the $13 Billion Agreement.

49.     The $13 Billion Agreement specifies the amounts of money that JP Morgan Chase must pay to eliminate all of its liability regarding the unspecified potential civil claims held by the DOJ and the four states, and to terminate each of the Related Actions brought by the FDIC, the FHFA, the NCUA, and the State of New York.  $13 Billion Agreement at 3-5.  Those payments total $13 billion ("Agreement Amount"), apportioned as follows—

       a.      $2 billion is a civil monetary penalty that the DOJ obtained "pursuant to" FIRREA and solely related to the illegal conduct of JP Morgan Chase.

       b.      $4 billion is purportedly for "consumer relief" that the DOJ obtained in exchange for releasing JP Morgan Chase of liability under enumerated federal statutes and common law theories, "to remediate harms allegedly resulting from unlawful conduct of JP Morgan, Bear Stearns, and Washington Mutual."

       c.      The remaining $7 billion is allocated in varying amounts, in accordance with an unknown formula, to California, Delaware, Illinois, and Massachusetts (the four

state parties to the $13 Billion Agreement), as well as the FDIC, the FHFA, the NCUA, and the State of New York (the plaintiffs in the Related Actions).

    A.    <u>The $13 Billion Agreement resolved potential civil claims arising from illegal conduct by JP Morgan Chase that was willful and pervasive.</u>

50.    Attached to the $13 Billion Agreement and incorporated by reference is a very short, largely uninformative summary of conduct engaged in by some unidentified staff, managers, and officers of JP Morgan Chase, which the DOJ and JP Morgan Chase refer to as a "Statement of Facts" ("SOF").  However, as alleged below, the SOF contains very few facts or details concerning the unidentified "potential legal claims."  It does describe, in general terms, an egregious, systemic pattern of intentional misrepresentations and omissions by JP Morgan Chase, Bear Stearns, and Washington Mutual spanning several years in connection with the creation, packaging, marketing, sale, issuance, and distribution of an unknown number of Subprime Securities leading up to and contributing to the Financial Crisis.

51.    Each of the three banks securitized an undisclosed number of subprime and Alt-A mortgage loans, representing undisclosed dollar amounts, into 1,605 Subprime Securities and allegedly fraudulently sold them to an unknown number of investors, including their customers, clients, and counterparties.  This process was supposed to be subject to guidelines, procedures, and various layers of review, both internally and by third-party service providers, to ensure that only properly underwritten loans were included in each Subprime Security.

52.    According to the DOJ, each bank represented to investors (again, their customers, clients, and counterparties) that their Subprime Securities complied with their stated controls and procedures.  However, contrary to those representations, the banks repeatedly and knowingly failed to follow those controls and procedures, and they included an unknown, but apparently large number of improperly underwritten loans in their securitization pools.  As a result,

investors were fraudulently induced to purchase an unknown number of high-risk securities that were virtually certain to lose money.  The magnitude of investor losses resulting from the alleged fraudulent conduct is nowhere specified or estimated in the $13 Billion Agreement.

53.     Moreover, it is apparent that management level employees, although unidentified, participated to an undisclosed extent in this fraud.  For example, on one occasion, unidentified "due diligence employees and at least two [unidentified] JPMorgan managers," determined that several pools of loans from just one unidentified lender contained "numerous" loans where borrowers had overstated their incomes.  SOF at 5-6.  Some of those unidentified JP Morgan Chase employees and managers concluded that those pools "should be reviewed in their entirety, and all unreasonable stated income loans eliminated before the pools were purchased." *Id*.  One unidentified JP Morgan Chase employee even "told an [unidentified] Executive Director in charge of due diligence and a [unidentified] Managing Director in trading that due to their poor quality, the [unidentified] loans should not be purchased and should not be securitized." *Id*.

54.     After the unidentified originator of the loan pools objected, unidentified JPMorgan Managing Directors from several departments (due diligence, trading, and sales) met with unidentified representatives of the unidentified originator to discuss the loans.  However, notwithstanding the concerns and recommendations of multiple due diligence employees and managers, JP Morgan Chase purchased two loan pools without reviewing those loan pools in their entirety; waived a number of the stated income loans into the pools; purchased the pools; securitized hundreds of millions of dollars of loans from those pools into one security; and then sold them to an unidentified number of investors, for unidentified amounts, without disclosing the problems with the loans, presumably resulting in unidentified losses.

55.     Although not stated and certainly not detailed, the SOF and the $13 Billion Agreement suggest that this episode was part of, and illustrative of, a pervasive pattern and practice of knowing, fraudulent conduct at JP Morgan Chase over the years.

B.     The fraudulent conduct resolved through the $13 Billion Agreement was extraordinarily damaging to investors, financial markets, and the entire economy.

56.     Neither the $13 Billion Agreement nor the SOF provide any quantitative measure, or even estimate, of the harm that JP Morgan Chase inflicted on investors and others through its fraudulent conduct.  However, the uninformative list of 1,605 securitizations and the $13 Billion Agreement make clear that the damages inflicted by JP Morgan Chase had to be very substantial, undoubtedly tens of billions of dollars and almost certainly hundreds of billions of dollars in damages.

57.     Indeed, the DOJ's own publicity surrounding the $13 Billion Agreement hints at the enormity of the harm done by JP Morgan Chase's abuses.  For example, the DOJ Press Release announcing the $13 Billion Agreement provides some indication, albeit in little more than short sound-bites, of the central role that the fraud played in triggering the Financial Crisis. The Press Release contains a number of testimonials from DOJ officials about the purportedly enormous value of the $13 Billion Agreement and the seriousness of the violations at issue, including the following:

a.     Defendant Attorney General Holder stated: "Without a doubt, the conduct uncovered in this investigation helped sow the seeds of the mortgage meltdown."

b.     Associate Attorney General Tony West stated: "The conduct JP Morgan [Chase] has acknowledged—packaging risky home loans into securities, then selling

them without disclosing their low quality to investors—contributed to the wreckage of the financial crisis."

        c.     U.S. Attorney for the Eastern District of California Benjamin Wagner stated: "Abuses in the mortgage-backed securities industry helped turn a crisis in the housing market into an international financial crisis . . . .  The impacts were staggering. JP Morgan Chase sold securities knowing that many of the loans backing those certificates were toxic.  Credit unions, banks, and other investor victims across the country, including many in the Eastern District of California, continue to struggle with losses they suffered as a result."

58.    Moreover, there is widespread consensus among academic experts, policy makers, and regulators that the type of illegal conduct underlying the $13 Billion Agreement was one of the central causes of the Financial Crisis and, therefore, the damages are likely historically high. FIN. CRISIS INQUIRY COMM'N, THE FINANCIAL CRISIS INQUIRY REPORT: FINAL REPORT OF THE NATIONAL COMMISSION ON THE CAUSES OF THE FINANCIAL AND ECONOMIC CRISIS IN THE UNITED STATES, 165-69 (2011); CARL LEVIN, CHAIRMAN & TOM COBURN, RANKING MINORITY MEMBER, U.S. PERMANENT SUBCOMM. ON INVESTIGATIONS: COMM. ON HOMELAND SEC. & GOV'T AFFAIRS, WALL STREET AND THE FINANCIAL CRISIS: ANATOMY OF A FINANCIAL COLLAPSE 75 (Apr. 13, 2011) *available at* http://www.hsgac.senate.gov//imo/media/doc/Financial_Crisis/FinancialCrisisReport.pdf.

59.    None of this is to suggest that JP Morgan Chase alone is to blame for the Financial Crisis or the damages it caused.  But it appears clear from the $13 Billion Agreement, the DOJ press release and other statements, and the SOF that the damages JP Morgan Chase itself caused were very high.  Yet no one has any idea of what they were in fact because the DOJ

and JP Morgan Chase's $13 Billion Agreement was carefully crafted to ensure that as little as possible was disclosed to the public and nothing was ever disclosed to a court.

        C.    <u>Notwithstanding the apparent gravity of JP Morgan Chase's fraud, the enormous harm it caused, and the extraordinary importance of the $13 Billion Agreement to the public, the DOJ never filed an action in court, thus avoiding the development of a sufficient record and a judicial determination as to the adequacy of the $13 Billion Agreement.</u>

60.    The DOJ never filed an action in court and never sought any review or approval of the $13 Billion Agreement by any court.  Indeed, the $13 Billion Agreement confirms its nonjudicial character, stating that "[t]he Parties acknowledge that this $13 Billion Agreement is made without any trial or adjudication or finding of any issue of fact or law, and is not a final order of any court or governmental authority."  $13 Billion Agreement at 15.

61.    The $13 Billion Agreement is a mere contract between the DOJ and JP Morgan Chase.

62.    As a consequence of the DOJ's decision to enter the $13 Billion Agreement in the form of a mere contract, without any review or assessment by any court:

        a.    The DOJ never filed a complaint detailing the specific acts and violations of law committed by JP Morgan Chase and the individuals responsible for those acts and violations.

        b.    The DOJ never filed a motion or memorandum with a court, or participated in any hearing convened by the court, to explain how the relief obtained under the $13 Billion Agreement was justified in light of all the facts and circumstances, including the gravity of the violations, the profits received by JP Morgan Chase from its violations, and the magnitude of the harms inflicted on investors and other victims.

c.      The DOJ never participated in an open judicial proceeding that would have allowed interested parties to seek intervention or *amicus curiae* status so that their views on the matter could be considered by a court.

d.      Most importantly, the DOJ never subjected the $13 Billion Agreement to an independent judicial determination as to whether the terms were appropriate and in the public interest under the applicable legal standard and all the facts and circumstances.

63.      Without the benefit of these proceedings, and without full disclosure of all material facts relating to JP Morgan Chase's illegal activity and its impact, neither the $13 Billion Agreement itself nor the DOJ's actions in connection with the $13 Billion Agreement can be subjected to meaningful review by anyone.

D.      Instead of seeking judicial review, the DOJ documented the $13 Billion Agreement in a way that failed to disclose important information about virtually every material aspect of the deal.

64.      Rather than initiating an action in federal court, detailing the allegations against JP Morgan Chase, and engaging in a public process through which a court would either adjudicate the DOJ's claims through trial or review and approve any settlement of those claims, the DOJ memorialized the terms of the $13 Billion Agreement in a way that minimized public disclosure of the facts of the case, the laws that were broken, and the basis for the $13 Billion Agreement.

65.      The $13 Billion Agreement is embodied in just two short documents, the $13 Billion Agreement itself and the SOF.  Although the $13 Billion Agreement is accompanied by several attachments, those items simply include a short outline regarding implementation of the $4 billion in "consumer relief"; a list of the 1,605 Subprime Securities offerings encompassed by

the $13 Billion Agreement; and the settlement agreements in the Related Actions between JP Morgan Chase and other state and federal regulatory authorities.

66.     This documentation provides only a skeletal description of JP Morgan Chase's illegal conduct, and it omits an abundance of critically important information necessary to adequately evaluate the $13 Billion Agreement, including

a.     the scope of the investigation;

b.     the underlying illegal conduct;

c.     the specific violations of law committed;

d.     the benefits (monetary and otherwise) received by JP Morgan Chase;

e.     the damages inflicted on investors and other victims by JP Morgan Chase;

f.     the impact of those violations in terms of contributing to the Financial Crisis;

g.     the individuals involved in and responsible for the violations; and

h.     the appropriateness of the civil monetary penalty and other relief included in the $13 Billion Agreement under all the facts and circumstances.

67.     Specifically, the $13 Billion Agreement and the SOF omit important information about virtually every material aspect of the deal, including, without limitation, the following:

a.     The $13 Billion Agreement does not describe the nature, scope, or thoroughness of the investigation that led to the $13 Billion Agreement, including such basic information as the duration of the investigation; the number and nature of the documents actually reviewed; and the number of individuals, including executives and supervisors, who were substantively interviewed, who were deposed under oath, or who provided sworn statements or other evidence.  Instead, the $13 Billion Agreement simply

recites that "[t]he Department of Justice **conducted investigations** of the packaging, marketing, sale, and issuance of residential mortgage-backed securities" by the settling banks, and it lists the small subset of Subprime Securities offerings covered by the $13 Billion Agreement that the DOJ actually reviewed: a mere 10 out of 1,605.  $13 Billion Agreement at 1 (emphasis added); SOF at 2 n. 2.   Thus, there is no way to determine if the so-called investigation was adequate to develop a sufficient basis for the $13 Billion Agreement.

b.       The $13 Billion Agreement does not describe in any meaningful detail the illegal conduct by JP Morgan Chase that gave rise to the civil monetary penalty, including an explanation of how those 1,605 Subprime Securities were selected for coverage under the $13 Billion Agreement; the number, type, and content of the misrepresentations and omissions that JP Morgan Chase committed, both in documents and orally; and when the acts of misconduct occurred.   Nor does the $13 Billion Agreement attach any of the term sheets and offering materials for the Subprime Securities listed in Annex 3.  Instead, the SOF employs vague terms and phrases, such as

      i.        "large amounts;"

      ii.       "in certain instances;"

      iii.     "at least some of the loan pools;"

      iv.     "in various offering documents;"

      v.       "certain pools;"

      vi.      "a number of;"

      vii.    "certain investors;"

      viii.   "purchasers;" and

ix.    "a number of loans."

c.    The $13 Billion Agreement does not identify, by name and title, a single JP Morgan Chase or other individual who was responsible for or involved in the illegal conduct.  For example, there is no disclosure of the individual employees, managers, and executives who committed any of the violations, aided and abetted any violations, or acted as controlling persons with respect to others who committed any violations.  Instead, the SOF either simply attributes actions to inanimate objects (such as "JP Morgan" or the "offering documents") or it employs generic descriptions (such as "employee," "salespeople," "due diligence managers," "Executive Director," "Managing Director," or "personnel").

d.    The $13 Billion Agreement does not identify any specific violations of any statute that supports the civil monetary penalty or the other relief obtained in the $13 Billion Agreement.  The recitals in the $13 Billion Agreement merely refer vaguely to "**potential claims** by the United States against JP Morgan, . . . for violation of **federal laws** in connection with the packaging, marketing, sale, and issuance of RMBS."  $13 Billion Agreement at 1 (emphasis added).  Similarly, the provision in the $13 Billion Agreement identifying all claims released by the United States simply lists five federal statutes and a series of general common law theories of liability, and incorporates by reference a vast collection of statutes that the DOJ has authority to "assert and compromise pursuant to 28 C.F.R. § 0.45."  The $13 Billion Agreement does not identify any specific provisions of any law that JP Morgan Chase violated.  *Id.* at 8.

e.    The $13 Billion Agreement does not specify, or even estimate, the monetary harm that the fraudulent conduct inflicted, either directly or indirectly, on

investors, mortgagors, market participants, financial markets, the U.S. economy, or any other persons or institutions, including in particular JP Morgan Chase's clients, customers, and counterparties.

f.     The $13 Billion Agreement does not specify, or even estimate, the gross or net monetary gains or other benefits that JP Morgan Chase received as a direct or indirect result of its fraudulent conduct, including profits; fees; other profitable transactions or deals that were facilitated; losses that were avoided; and any support in the share price of JP Morgan Chase that was traceable to the illegal conduct.

g.     The $13 Billion Agreement does not explain how the $2 billion civil monetary penalty was calculated, or how the civil penalty can effectively punish JP Morgan Chase for its past illegal conduct, or deter its future illegal conduct, given JP Morgan Chase's size, revenues, and profits, and given JP Morgan Chase's recidivist history of pervasive, systemic, and knowing violations of law over many years.  In fact, JP Morgan Chase is the largest financial institution in the United States, with $2.4 trillion in assets; $100 billion in net revenues in 2013; and $18 billion in net income in 2013 (**after** accounting for $11.1 billion in legal expenses).

h.     The $13 Billion Agreement does not take into account the profoundly difficult challenges involved in punishing and deterring JP Morgan Chase, and assessing any effective penalty against it, in light of its extensive history of violating federal laws, as evidenced by the following highlights of just some of the many government enforcement actions against it:

(1)     *United States v. JPMorgan Case Bank, NA*, No-1:14-cr-7 (S.D.N.Y. Jan 8, 2014) ($1.7 billion criminal penalty); *In re JPMorgan Chase*

*Bank, N.A.*, OCC Admin. Proceeding No. AA-EC-13-109 (Jan. 7, 2014) ($350 million civil penalty); *In re JPMorgan Chase Bank, N.A.*, Dept. of the Treasury Financial Crimes Enforcement Network Admin. Proceeding No. 2014-1 (Jan. 7, 2014) ($461 million civil penalty) (all for violations of law arising from the bank's role in connection with Bernie Madoff's Ponzi scheme, the largest in the history of the U.S.);

(2)    *In re JPMorgan Chase Bank, N.A.,* CFTC Admin. Proceeding No. 14-01 (Oct. 16, 2013) ($100 million civil penalty); *In re JPMorgan Chase & Co.,* SEC Admin. Proceeding No. 3-15507 (Sept. 19, 2013) ($200 million civil penalty); *In re JPMorgan Chase & Co.*, Federal Reserve Board Admin. Proceeding No. 13-031-CMP-HC (Sept. 18, 2013) ($200 million civil penalty); UK Financial Conduct Authority, Final Notice to JP Morgan Chase Bank, N.A. (Sept. 18, 2013) (£137.6 million ($221 million) penalty); *In re JPMorgan Chase Bank, N.A.*, OCC Admin. Proceeding No. AA-EC-2013-75, #2013-140 (Sept. 17, 2013) ($300 million civil penalty) (all for violations of federal law in connection with the proprietary trading losses sustained by JP Morgan Chase in connection with the high risk derivatives bet referred to as the "London Whale");

(3)    *In re JPMorgan Chase Bank, N.A.*, CFPB Admin. Proceeding No. 2013-CFPB-0007 (Sept. 19, 2013) ($20 million civil penalty and $309 million refund to customers); *In re JPMorgan Chase Bank, N.A.,* OCC Admin. Proceeding No. AA-EC-2013-46 (Sept. 18, 2013) ($60 million civil penalty) (both for violations in connection with JP Morgan Chase's billing practices and fraudulent sale of so-called Identity Protection Products to customers);

(4)     *In Re Make-Whole Payments and Related Bidding Strategies*, FERC Admin. Proceeding Nos. IN11-8-000, IN13-5-000 (July 30, 2013) (civil penalty of $285 million and disgorgement of $125 million for energy market manipulation);

(5)     *SEC v. J.P. Morgan Sec. LLC,* No. 12-cv-1862 (D.D.C. Jan. 7, 2013) ($301 million in civil penalties and disgorgement for improper conduct related to offerings of mortgage-backed securities);

(6)     *In re JPMorgan Chase Bank, N.A.*, CFTC Admin. Proceeding No. 12-37 (Sept. 27, 2012) ($600,000 civil penalty for violations of the Commodities Exchange Act relating to trading in excess of position limits);

(7)     *In re JPMorgan Chase Bank, N.A.*, CFTC Admin. Proceeding No. 12-17 (Apr. 4, 2012) ($20 million civil penalty for the unlawful handling of customer segregated funds relating to the bankruptcy of Lehman Brothers Holdings, Inc.);

(8)     *United States v. Bank of America*, No. 12-cv-00361 (D.D.C. 2012) (for foreclosure and mortgage-loan servicing abuses during the Financial Crisis, with JP Morgan Chase paying $5.3 billion in monetary and consumer relief);

(9)     *In re JPMorgan Chase & Co.*, Federal Reserve Board Admin. Proceeding No. 12-009-CMP-HC (Feb. 9, 2012) ($275 million in monetary relief for unsafe and unsound practices in residential mortgage loan servicing and foreclosure processing);

(10)    *SEC v. J.P. Morgan Sec. LLC*, No. 11-cv-03877 (D.N.J. July 7, 2011) ($51.2 million in civil penalties and disgorgement); *In re JPMorgan Chase*

*& Co.*, Federal Reserve Board Admin. Proceeding No. 11-081-WA/RB-HC (July 6, 2011) (compliance plan and corrective action requirements); *In re JPMorgan Chase Bank, N.A.*, OCC Admin. Proceeding No. AA-EC-11-63 (July 6, 2011) ($22 million civil penalty) (all for anticompetitive practices in connection with municipal securities transactions);

(11)     *SEC v. J.P. Morgan Sec., LLC,* No. 11-cv-4206 (S.D.N.Y. June 21, 2011) ($153.6 million in civil penalties and disgorgement for violations of the securities laws relating to misleading investors in connection with synthetic collateralized debt obligations);

(12)     *In re JPMorgan Chase Bank, N.A.*, OCC Admin. Proceeding No. AA-EC-11-15, #2011-050 (Apr. 13, 2011) (consent order mandating compliance plan and other corrective action resulting from unsafe and unsound mortgage servicing practices);

(13)     *In re J.P. Morgan Sec. Inc.*, SEC Admin. Proceeding No. 3-13673 (Nov. 4, 2009) ($25 million civil penalty for violations of the securities laws relating to the Jefferson County derivatives trading and bribery scandal);

(14)     *In re JP Morgan Chase & Co,* Attorney General of the State of NY Investor Protection Bureau, Assurance of Discontinuance Pursuant to Exec. Law §63(15) (June 2, 2009) ($25 million civil penalty for misrepresenting risks associated with auction rate securities);

(15)     *In re JPMorgan Chase & Co.*, SEC Admin. Proceeding No. 3-13000 (Mar. 27, 2008) ($1.3 million civil disgorgement for violations of the

securities laws relating to JPM's role as asset-backed indenture trustee to certain special purpose vehicles);

(16)   *In re J.P. Morgan Sec. Inc.,* SEC Admin. Proceeding No. 3-11828 (Feb. 14, 2005) ($2.1 million in civil fines and penalties for violations of Securities Act record-keeping requirements); and

(17)   *SEC v. J.P. Morgan Securities Inc.*, 03-cv-2939 (WHP) (S.D.N.Y. Apr. 28, 2003) ($50 million in civil penalties and disgorgements as part of a global settlement for research analyst conflict of interests).

i.      The $13 Billion Agreement does not explain how the $4 billion in "consumer relief" was calculated or why the judicial power to enforce such obligations was never sought as a component of the $13 Billion Agreement.

j.      The $13 Billion Agreement does not explain how any of the other monetary amounts to be paid by JP Morgan Chase under the $13 Billion Agreement were calculated and apportioned.

k.      The $13 Billion Agreement does not explain why it fails to impose on JP Morgan Chase **any** obligation to change **any** of its business or compliance practices, which are conduct remedies that regulators routinely require as a condition of settling allegations of wrongdoing by a financial institution of much lesser significance than present here.

l.      The $13 Billion Agreement does not explain whether JP Morgan Chase faces collateral regulatory consequences from the imposition of a penalty under FIRREA or any other aspect of the $13 Billion Agreement; whether JP Morgan Chase will be immunized from any such collateral consequences as part of the $13 Billion Agreement;

and if JP Morgan Chase has been so immunized, how that is justified in light of the gravity of the illegal misconduct at issue.

   m. The $13 Billion Agreement does not contain admissions of fact or law by JP Morgan Chase.

  68. In addition to omitting a vast amount of critically important information, as detailed above, the $13 Billion Agreement is in some important respects misleading, seemingly by design.  For example, while the $13 Billion Agreement creates the impression that it **does** contain admissions by JP Morgan Chase, in reality it does not.  The $13 Billion Agreement states that "JP Morgan [Chase] **acknowledges** the facts set out in the" SOF.  $13 Billion Agreement at 3 (emphasis added).  There is no disclosure explaining why there are no admissions of either law or fact and there is no disclosure of the legal significance, if any, of JP Morgan Chase's "acknowledgement."

  69. Yet, when the DOJ portrayed this statement as an admission, JP Morgan Chase issued a prompt and public rebuke.  On the date the settlement was announced, the DOJ stated that "[a]s part of the settlement, JP Morgan [Chase] acknowledged it made serious misrepresentations to the public."  Press Release.  This claim reportedly prompted Marianne Lake, Chief Financial Officer for JP Morgan Chase, to contradict the DOJ statement by insisting that: "[w]e didn't say that we acknowledge serious misrepresentation of the facts."  She added that "[w]e would characterize potentially the statement of facts differently than others might." According to Ms. Lake, JP Morgan Chase acknowledged the SOF without admitting violations of law.  Hugh Son et al., *JPMorgan $13 Billion Mortgage Deal Seen as Lawsuit Shield*, Bloomberg (Nov. 20, 2013), *available at* http://www.bloomberg.com/news/2013-11-20/jpmorgan-13-billion-mortgage-deal-seen-as-lawsuit-shield.html. Jamie Dimon,   Chief

Executive Officer of JP Morgan Chase, also insisted publicly that "[w]e did not admit to a violation of law."  Michael Hiltzik, *Bottom line on JPMorgan's $13 billion settlement: not nearly enough,* LA TIMES (Nov. 19, 2013), *available* at http://articles.latimes.com/2013/nov/19/business/la-fi-mh-jpmorgans-20131119.

70.     Simple admissions would have cleared all this up, but presumably JP Morgan Chase refused to admit anything and the DOJ accepted that.  As a consequence, the misleading and apparently meaningless term "acknowledgement" was used, which caused many, including sophisticated and informed observers, to nonetheless conclude that the "acknowledgement" was in fact admissions.  For example, Jonathan Weil, a columnist for Bloomberg View, wrote "Leave it to a bunch of politicians to misrepresent what JPMorgan Chase & Co. **admitted** as part of a settlement over the bank's supposed misrepresentations" and he repeatedly referred to what he called JP Morgan Chase's "**admissions,**" even though there were none.  Jonathan Weil, *Why Believe What the Government Says About JPMorgan?,* BLOOMBERG (Nov. 19, 2013), *available at*  http://www.bloomberg.com/news/2013-11-19/why-believe-what-the-government-says-about-jpmorgan-.html (emphasis added).

71.     Mr. Weil concluded by stating that "There is nothing in JPMorgan's admissions that would be damaging to the company."  *Id.*  That is all the more so because there were no JP Morgan Chase admissions at all; it only "acknowledged" the SOFs and everyone is left to wonder why the DOJ allowed such a meaningless and even misleading provision to be included in the agreement.

72.     Moreover, as also observed by Mr. Weil, "It isn't a good sign when the company paying billions of dollars to resolve a government probe comes across as more believable than the government lawyers who cut the deal."  Jonathan Weil, *The JPMorgan Settlement Isn't*

*Justice*, BLOOMBERG (Nov. 21, 2013), *available at* http://www.bloomberg.com/news/2013-11-21/the-jpmorgan-settlement-isn-t-justice.html.

> E.   The process that lead to the $13 Billion Agreement highlights the need for judicial review.

73.   The little information that is available concerning the settlement process has been reported in the press.   It indicates that the DOJ and JP Morgan Chase went to extraordinary lengths to minimize the disclosure of information about the $13 Billion Agreement and the underlying illegal conduct. As a result, of course, no one can scrutinize or evaluate what the DOJ has done here.

74.   For example, media outlets reported the following series of events surrounding JP Morgan Chase's successful, eleventh-hour effort to prevent the DOJ from filing a complaint against the bank and revealing to the American people JP Morgan Chase's years of illegal conduct:

> a.   The DOJ decided to file a civil lawsuit against JP Morgan Chase on or about September 24, 2013, for its role in the fraudulent offer and sale of toxic securities during the period leading up to the Financial Crisis.   The DOJ planned a press conference for on or about the morning of September 24 to announce the filing of the case and to detail the allegations of massive illegal conduct against JP Morgan Chase.

> b.   In preparation for the news conference, the U.S. Attorney for Sacramento, Mr. Benjamin Wagner, flew to Washington D.C. on or about September 23, 2013, with at least two large charts detailing JP Morgan Chase's illegal conduct.   U.S. Attorney Wagner had amassed nationwide evidence of fraudulent activity by JP Morgan Chase itself, apart from the conduct of either Bear Stearns or Washington Mutual.   Further, the DOJ had the benefit of detailed information from at least one employee inside the bank, a

whistleblower, who was assisting prosecutors.  The DOJ planned to display those charts during the news conference as part of the presentation of the lawsuit describing JP Morgan Chase's illegal conduct.

c.       Also on or about September 23, 2013, the day before the planned news conference, the DOJ sent a copy of the complaint it was planning to file the next day to JP Morgan Chase.

d.       On or about September 24, 2013, just hours before the press conference, JP Morgan Chase's Chief Executive Officer, Jamie Dimon, telephoned a high-ranking Justice Department official involved in the case, Associate Attorney General Tony West, the third most senior official at the DOJ.  At the time he received the phone call, Associate Attorney General West was "put[ting] the finishing touches on a lawsuit against JP Morgan Chase [when] he saw a **familiar** number flash on his cell phone." Ben Protess & Jessica Silver-Greenberg, *In Extracting Deal From JPMorgan, U.S. Aimed for Bottom Line*, NYTIMES DEALBOOK, Nov. 19, 2013, *available at* http://dealbook.nytimes.com/2013/11/19/13-billion-settlement-with-jpmorgan-is-announced/ (emphasis added).

e.       During the call, Mr. Dimon sought to prevent the DOJ from publicly filing the lawsuit against JP Morgan Chase, signaled a willingness to very significantly increase the bank's settlement offer, and requested an in-person meeting with the Attorney General.

f.       Following that discussion, the DOJ canceled the planned press conference and the filing of the lawsuit.

g.     Two days after that phone call, on or about Thursday, September 26, 2013, Mr. Dimon flew to Washington, D.C. to lead face-to-face negotiations with the Attorney General at the DOJ.  Thereafter, Mr. Dimon personally spoke to the Attorney General approximately five times as they negotiated the terms of the $13 Billion Agreement. During those negotiations, Mr. Dimon more than **quadrupled** the bank's reported settlement offer, from $3 billion to $13 billion.

75.     The filing of that lawsuit would have provided the public with a detailed account of the specific acts and omissions of JP Morgan Chase and its executives, supervisors, and employees, as they engaged in a pervasive pattern of fraud in the offer and sale of billions of dollars' worth of toxic Subprime Securities to their clients, customers, counterparties, investors, and others.

76.     Evidence of the profoundly damaging impact that the public filing of the complaint would have had on JP Morgan Chase is also reflected in JP Morgan Chase's staunch refusal to produce the draft complaint to the Federal Home Loan Bank Board of Pittsburgh ("FHLB") in other litigation.

a.     On November 23, 2009, FHLB sued various JP Morgan Chase affiliates and three credit-rating agencies in Pennsylvania state court over losses sustained from $1.8 billion in mortgage-backed securities that FHLB had purchased in 2006 and 2007. *FHLB v. J.P. Morgan Securities LLC,* No. GD-09-016892 (Ct. C.P. Allegheny County, Pa. Nov. 23, 2013)

b.     When it became aware of the existence of a draft DOJ complaint against JP Morgan Chase, a copy of which the DOJ had provided to JP Morgan Chase, the FHLB

sought its production. On October 17, 2013, the state court ordered the draft complaint to be produced to the FHLB.

c.      In response to requests from the DOJ, the FHLB agreed to two extensions of the deadline for production of the draft complaint, so as not to disturb the ongoing settlement negotiations between the DOJ and JP Morgan Chase in connection with what became the $13 Billion Agreement.

d.      Those settlement negotiations culminated on November 19, 2013, when the $13 Billion Agreement was announced. Yet even then, JP Morgan Chase refused to produce the draft complaint to FHLB. JP Morgan Chase actually moved to vacate the state court's order of production on November 22, 2013. JP Morgan Chase argued strenuously that the draft complaint was protected from production as a confidential settlement document; that the SOF released by the DOJ in connection with the $13 Billion Agreement made it unnecessary to force disclosure of the draft complaint; and that the draft complaint was not reasonably calculated to lead to the discovery of admissible evidence.

e.      On November 26, 2013, FHLB filed a motion to compel JP Morgan Chase's compliance with the state court's October 17 order requiring production of the DOJ's draft complaint. In the motion, FHLB aptly characterized both the anticipated value of the draft complaint and some of the policy concerns arising from JP Morgan Chase's assiduous efforts to keep it cloaked in secrecy:

> The most important public policy issue here is transparency—what did DOJ actually learn about JP Morgan's conduct which caused JP Morgan [Chase] to pay $13 billion? The Statement of Facts does not answer that question. . . . The draft complaint most likely provides **a rich source of detailed facts about JP Morgan's conduct that have not been made public**. And those facts should be made public, not only to aid private

litigants such as Pittsburgh FHLB in the pursuit of their claims, but also **to inform the public of the basis for the DOJ's settlement.**"   Plaintiff's Motion to Compel Compliance with the Court's October 17, 2013 Order, FHLB v. J.P. Morgan Securities LLC, No. GD-09-016892 (Ct. C.P. Allegheny County, Pa. filed Nov. 26, 2013) (emphasis added).

f.      However, before that motion was ruled upon, JP Morgan Chase agreed to settle all of FHLB's claims, on **undisclosed** terms, thus ensuring that the draft complaint would never see the light of day in that case and ensuring that their conduct and the terms of settlement would never see the light of day in the Pennsylvania case either.

77.     The same overriding desire to minimize public disclosure, transparency, and judicial oversight relating to the $13 Billion Agreement and the actions underlying it was also apparent in the way the Related Actions were resolved.  In all of those cases, the parties to those actions, including plaintiffs FDIC, FHFA, NCUA, and the State of New York, agreed to seek either voluntary dismissal or a stipulation of discontinuance, with prejudice, of the actions. Moreover, in none of those cases did the parties actually file the $13 Billion Agreement with the court, or the separate agreements pursuant to which those Related Actions were settled.  This procedure enabled the parties to those actions to avoid any public, substantive judicial oversight, scrutiny, or evaluation of the terms under which those actions were settled.

F.      <u>The DOJ also disregarded the explicit requirements of FIRREA by obtaining the historic $2 billion civil monetary penalty without any judicial assessment.</u>

78.     Under the $13 Billion Agreement, the DOJ assessed and extracted a $2 billion civil monetary penalty from JP Morgan Chase.  The $13 Billion Agreement expressly states that the penalty was "recovered [by the DOJ] pursuant to FIRREA, 12 U.S.C. § 1833a."  $13 Billion Agreement at 3.  Elsewhere, the $13 Billion Agreement states that the "$2 billion will be paid as a civil monetary penalty pursuant to FIRREA."  *Id.* at 7.  The Press Release further confirms that

the DOJ was relying on FIRREA as the statutory basis for the penalty and that it was "the largest FIRREA penalty in history".  It states that:

   a.  "JP Morgan [Chase] will pay $2 billion as a civil penalty to settle the Justice Department's claims under the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA);"

   b.  "By requiring JP Morgan [Chase] both to pay the largest FIRREA penalty in history and provide some needed consumer relief to areas hardest hit by the financial crisis, we rectify some of that harm today" (quoting Associate Attorney General Tony West); and

   c.  "Today's global settlement underscores the power of FIRREA and other civil enforcement tools" (quoting Assistant Attorney General for the Civil Division Stuart F. Delery).

  79.  However, the DOJ ignored the explicit provisions in FIRREA that require a court to assess any civil monetary penalty sought pursuant to the statute.  FIRREA provides that:

> (a)  In general.  Whoever violates any provision of law to which this section is made applicable by subsection (c) shall be subject to a civil penalty **in an amount assessed by the court in a civil action under this section.**

12 U.S.C. § 1833a(a) (emphasis added).

  80.  In addition, FIRREA requires the Attorney General to file a civil action to recover a civil penalty:

> (e) Attorney General to bring action.  A civil action to recover a civil penalty under this section **shall be commenced by the Attorney General**.

12 U.S.C. § 1833a(e) (emphasis added).

  81.  The legislative history of FIRREA explains the purpose of FIRREA and the method for obtaining the civil penalty as follows:

The Committee believes that the enhancement of the regulatory powers and criminal justice provisions should go far in restoring public confidence in the nation's financial system and serve to protect the public interest.  This Title gives the regulators and the Justice Department the tools which they need and the responsibilities they must accept, to punish culpable individuals, to turn this situation around, and to prevent these tremendous losses to the Federal deposit insurance funds [due to the savings and loan crisis] from ever again recurring. . . . **The Attorney General recovers the civil penalty through a civil action brought in a United States district court.**"  H. Rep. No. 101-54, Part 1 (May 16, 1989) (H.R. 1278), at 465-66; 472 (emphasis added).

82.     In violation of these requirements, the DOJ negotiated, finalized, and executed the $13 Billion Agreement without filing any court action and without seeking or obtaining a judicial assessment of the civil monetary penalty.

83.     Had the DOJ filed an action against JP Morgan Chase to enforce the law and to obtain relief, including the $2 billion penalty under FIRREA, as required, the reviewing court would have been called upon to exercise its judgment regarding the penalty amount in light of the acts and omissions of JP Morgan Chase, the violations of law at issue, and a host of other factual and legal issues.  To that end, the court would have been entitled to ask for and consider a wide range of information concerning the facts of the case, the DOJ's investigation, and the appropriate civil penalty, including, without limitation, the missing information detailed above.

84.     For example, under applicable case law, much of the information listed above has been found relevant to a court's assessment of the appropriate civil penalty under FIRREA, including a defendant's degree of scienter; the extent of injury to the public; whether the defendant's conduct created substantial losses to other persons; the egregiousness of the violations; the isolated or repeated nature of the violations; and the defendant's financial condition and ability to pay.  *See United States v. Menendez,* 2013 U.S. Dist. LEXIS 39584, No. 11-cv-06313 (C.D. Calif. Mar. 6, 2013).  However, by extracting the penalty without complying

with FIRREA, the DOJ prevented any court from evaluating the appropriateness of the penalty in light of such factors, as provided by law.

G.  <u>The lack of transparency in the settlement process prevented a meaningful evaluation of the $13 Billion Agreement by anyone.</u>

85.  In short, the DOJ's decision to settle all of the potential claims encompassed by the $13 Billion Agreement through a private contract rather than a public judicial proceeding resulted in a public record that was devoid of any significant detail regarding the illegal conduct at issue, the consequences of that illegal conduct, and the extent to which the $13 Billion Agreement would effectively punish or deter JP Morgan Chase.

86.  By precluding any meaningful independent review and evaluation of the $13 Billion Agreement by a court, the DOJ was able to proclaim, with minimal risk of contradiction, that through the $13 Billion Agreement and its record-breaking monetary sanctions, it finally had held a large Wall Street bank accountable for the abuses that were a central cause of the Financial Crisis.  This is how the DOJ and the Attorney General have attempted to remove the dark cloud that has hung over them for years, particularly since the Attorney General's testimony suggesting that too-big-to-fail Wall Street banks receive favorable treatment from the DOJ.

87.  Yet it is far from clear that the terms of the $13 Billion Agreement will have any significant punitive or deterrent effect upon JP Morgan Chase, and without the indispensable safeguard provided by the judicial branch of government, there is no hope of ever knowing the actual merits or value of the $13 Billion Agreement.

      H.     <u>Because the DOJ reached the $13 Billion Agreement wholly outside of court, in a case of historic importance, the DOJ usurped the judiciary's constitutionally established review role, in violation of the separation of powers doctrine.</u>

88.     The U.S. Constitution establishes three distinct branches of government, the Executive, the Legislative, and the Judicial, each with defined powers and authorities. This framework protects against the accumulation of excessive power in any one branch, and it limits the ability of any one branch of government to encroach upon, usurp, or deny the authority of another. Most importantly, this concept embodies the most fundamental constitutional protection afforded to the American people: checks and balances.

89.     In this case, the DOJ violated the separation of powers doctrine by usurping judicial authority in at least two ways.

90.     First, while the DOJ may have the authority to decide whether to bring an enforcement action in the first instance, as well as the authority to supervise the conduct of **litigation** it initiates, 28 U.S.C. §§ 516, 519, Congress has never authorized the DOJ to pursue the type of monetary sanctions at issue in the $13 Billion Agreement entirely outside the purview of a court. For example, with respect to the civil monetary penalty under FIRREA, Congress has expressly provided that the Attorney General **must** seek such a remedy through an action in federal court.

91.     Therefore, it was incumbent upon the DOJ, in accordance with the Constitution, to bring its claims in these circumstances to a court either for adjudication or a judicially supervised settlement. Instead, the Executive Branch, acting through the DOJ, entered the $13 Billion Agreement, resolved its unspecified potential claims under Federal law, and imposed sanctions without filing an action in federal court and without seeking judicial approval of the

$13 Billion Agreement.  The DOJ thus usurped the role of the judiciary, without authority from Congress or the Constitution, in violation of the separation of powers doctrine.

92.     Second, regardless of any putative authority the DOJ may have to pursue or settle potential claims or to impose penalties without court involvement, the separation of powers doctrine forbids the exercise of such authority by the DOJ under the extraordinary circumstances of this case.

93.     Federal courts have the inherent authority to review settlements in cases that are extraordinarily complex and far-reaching in their impact on a large number of injured parties, an important industry, or the wider public interest.

94.     This is a case where the use of that inherent authority is essential.  According to the DOJ's own claims, the $13 Billion Agreement represents the "the largest settlement with a single entity in American history."  Press Release.  And, the $13 Billion Agreement is between the DOJ and the largest bank in the United States (and, indeed, the largest bank in the world if its assets are measured under international accounting standards).  In addition, JP Morgan Chase is a "systemically significant financial institution" under the 2010 Financial Reform Law, a designation reserved for the handful of largest bank holding companies because they pose a real and substantial threat to the entire financial system and economy of the U.S.  Moreover, JP Morgan has also been designated by the Financial Stability Board as a "global" systemically significant financial institution, due to its enormous size, complexity, and interconnectedness in international financial markets.

95.     The $13 Billion Agreement is also extraordinary in that it purports to hold JP Morgan accountable for a systemic course of egregious illegal conduct that contributed directly to the greatest financial calamity and economic disaster since the Great Depression.  The

Financial Crisis will almost certainly inflict at least $13 trillion in damages on our economy, as well as untold human suffering through massive and persistent unemployment; an historic surge in poverty and homelessness; millions of homes foreclosed and more foreclosures to come; the ongoing damage caused by the massive fiscal deficits resulting from the Financial Crisis; and the costs of the extraordinary monetary policy actions taken by the Federal Reserve Board to limit the damage caused by the crisis; among many other costs.

96.     The $13 Billion Agreement also involves many other extraordinary factors and circumstances, including, directly or indirectly, (a) a broad mix of federal and state regulatory and enforcement authorities; (b) the resolution of multiple pending and potential civil actions; (c) fraud in highly complex financial transactions; (d) massive harm to millions if not tens of millions of investors, homeowners, and citizens throughout the country; (e) billions of dollars in monetary relief in various forms, including a $2 billion penalty and a $4 billion "consumer relief" fund; (f) appointment of a monitor to oversee implementation of the consumer relief fund provision; (g) a potentially significant impact on the nation's largest participant in the financial services industry; and (h) the public's trust and confidence not only in our financial markets, but in our system of justice and government as well.

97.     Furthermore, the DOJ has indicated that the $13 Billion Agreement will serve as the template for similar agreements anticipated with the other biggest too-big-to-fail Wall Street banks for their role in triggering the Financial Crisis through the sale of toxic mortgage-backed securities.  The extraordinary importance of the $13 Billion Agreement will thus be multiplied in those other matters.

98.     Any enforcement action involving such an extraordinary combination of factors and having such a profound impact on the public interest, could not and should not be left for

47

resolution to a settlement negotiated in secret between the Executive Branch and some of the same bankers who wrecked such devastation on our financial system and our entire economy. Under these circumstances, the judiciary has a constitutionally assigned and protected role in safeguarding the public interest by adjudicating such claims, or overseeing any settlement the parties wish to enter in lieu of such adjudication. Accordingly, by circumventing the judicial process and keeping the case outside the judiciary's constitutional domain, the DOJ violated the separation of powers doctrine.

I. <u>In addition to violating the Separation of Powers doctrine, the DOJ has also acted in excess of its statutory authority, acted arbitrarily and capriciously, and adopted a general enforcement policy that abdicates its responsibilities.</u>

99. As explained above, the DOJ clearly acted in excess of its statutory authority by assessing and extracting an historically high $2 billion penalty from JP Morgan Chase pursuant to FIRREA without filing an action in federal district court and seeking a judicial assessment of that penalty.

100. In addition, the DOJ violated an express prohibition of the APA, 5 U.S.C. § 558, which provides that a "sanction" may not be imposed by an agency "except within jurisdiction delegated to the agency and as authorized by law." The DOJ's conduct in entering into the $13 Billion Agreement, including, without limitation, assessing and extracting the FIRREA penalty from JP Morgan Chase, constituted the imposition of a sanction in violation of Section 558 of the APA, 5 U.S.C. § 558.

101. Furthermore, by declaring its intention to use the $13 Billion Agreement as the template in futures cases involving the handful of too-big-to-fail Wall Street banks, the DOJ has adopted an enforcement policy that represents an abdication of its responsibility to enforce the law aggressively, transparently, and in accordance with the Constitution and laws of the United

States.  Such an approach to enforcement in such exceptionally important cases is a policy that must be, and is, subject to judicial review.

102.    Finally, the DOJ's decision to adopt such an enforcement policy, and to apply it in this case by entering the $13 Billion Agreement without seeking judicial review and approval, under the unprecedented and extraordinary circumstances, was also arbitrary and capricious.   In so doing, (a) the DOJ failed adequately to consider a host of relevant factors, including, without limitation, those enumerated in parts D and H above, as well as the need for the utmost transparency in the settlement process to help restore the public's confidence in our financial markets and our system of justice; (b) the DOJ inappropriately relied on certain factors, including, without limitation, the intense, self-interested, and overriding desire of JP Morgan Chase to prevent disclosure of detailed allegations concerning the matters that were settled; (c) the DOJ made a clear error of judgment by avoiding judicial review of the $13 Billion Agreement, given the requirements of the Constitution and the laws of the United States, and given the compelling need for public transparency and accountability in the process; and (d) the DOJ offered an explanation for its decision that runs counter to what the surrounding circumstances indicate, including, without limitation, the claim that the $13 Billion Agreement will effectively hold JP Morgan Chase, a bank with trillions of dollars in assets and an extraordinary history of recidivism, accountable for its role in triggering the Financial Crisis.

J.    <u>Better Markets has suffered injury as a result of the DOJ's decision to exclude the judicial branch from the settlement process, in violation of the separation of powers doctrine, FIRREA, and the APA and that injury is ongoing.</u>

103.    The DOJ's conduct has harmed, is harming, and will continue to harm Better Markets in at least the following ways, without limitation:

a.    <u>Conflict with mission.</u>  The $13 Billion Agreement directly undermines one of the primary missions of Better Markets.  Better Markets is dedicated to promoting settlements in enforcement actions that are transparent, based on an adequate record, strong enough to punish and deter misconduct, and, at least under the extraordinary circumstances present in this case, subjected to judicial review.  The $13 Billion Agreement has none of those attributes, and the DOJ's decision to enter the $13 Billion Agreement directly undermines Better Markets' mission.

b.    <u>Impairment of Better Markets' ability to advocate for and promote strong enforcement of the laws governing financial regulation.</u>  Because the DOJ never sought any form of judicial review of the $13 Billion Agreement, Better Markets has been deprived of a uniquely valuable assessment, and other uniquely valuable information, that it needs to pursue its advocacy activities, to critique the $13 Billion Agreement through its advocacy channels, and to more generally promote effective enforcement of the laws governing misconduct in the financial markets.

i.    There was no judicial determination regarding whether the $13 Billion Agreement should be approved and on what grounds.  Such a culmination of the judicial review process is an irreplaceable diagnostic tool that Better Markets needs to advocate for strong enforcement of the law.  Without an independent, reliable, judicial assessment of the efficacy of the DOJ's **current** enforcement efforts, including the settlement of potential claims as in the $13 Billion Agreement, Better Markets is hampered in its ability to identify, and to advocate for, any necessary **changes** in the DOJ's substantive approach to enforcement.

ii.       In addition, because the DOJ circumvented the judicial process, Better Markets was deprived of other information that it requires to advocate for effective enforcement of the law.  For example, no complaint was ever filed, so Better Markets was deprived of detailed factual and legal allegations setting forth the fraudulent conduct; the specific violations of law that resulted; the individuals responsible for those violations; and how those violations benefited JP Morgan Chase and harmed investors and other victims.  Better Markets was also deprived of the inherent reliability of the proceedings in federal court, relative to a privately negotiated agreement.  Further, the DOJ never had to justify or explain the terms of the $13 Billion Agreement to a court, either in motions, supplemental filings, or at hearings convened by a court.  Better Markets requires this information to carry out its advocacy activities and to educate the public, other regulators, and policy makers about necessary changes in the government's approach to enforcement.  Better Markets must have detailed, accurate, and comprehensive information about settlements, including the $13 Billion Agreement, to understand how well the relief obtained redresses the misconduct that occurred in light of the harm done, the benefits received, the recidivist history of the wrongdoers, and other factors.  Without this indispensable informational platform, Better Markets cannot effectively identify weaknesses in the $13 Billion Agreement or other settlements, and therefore cannot most effectively promote changes in the way our financial regulatory laws and rules are enforced.

iii.       In short, without a judicial evaluation of the $13 Billion Agreement, and the information that would be forthcoming in that process, Better

Markets has been and continues to be impeded in its ability to carry out its advocacy activities aimed at promoting transparent and effective financial regulation and law enforcement in the public interest.

c.      <u>Expenditure of resources to counteract the harmful effects of the DOJ's failure to seek judicial review and approval of the $13 Billion Agreement.</u>  Because the DOJ never sought any form of judicial review of the $13 Billion Agreement, Better Markets has been forced to expend resources to neutralize the harmful impact of the unlawful settlement procedure followed by the DOJ.  That deployment of resources is still underway, and it has entailed a public education and advocacy effort aimed at highlighting the lack of any judicial oversight or transparency in the settlement process, and questioning whether the substantive terms are in fact sufficiently strong to punish and deter JP Morgan Chase.

i.      For example, as a direct consequence of the unlawful settlement process, Better Markets was forced to expend significant resources advocating on its website and through the media, including blogs posts, press statements, and interviews, that because the $13 Billion Agreement would never be scrutinized by any court, the DOJ should disclose vastly more information about the $13 Billion Agreement for the benefit of the public; that the $13 Billion Agreement was not transparent, as it left many questions unanswered; and that the $13 Billion Agreement may in fact have been extremely lenient under all the circumstances. Moreover, the unlawful settlement process has required Better Markets to question and to counteract what appears to be a misleading public relations campaign effectuated by the DOJ in connection with the $13 Billion Agreement.

The DOJ has boldly and publicly asserted that the $13 Billion Agreement does in fact promote accountability on Wall Street, without providing any credible basis. Without judicial review, and the information that judicial review would generate, Better Markets cannot effectively counter what is in effect a potential fraud on the public.  At a minimum, Better Markets must engage in a more intensive public education effort regarding what appears to be an enforcement regime that is not adequately punishing or deterring Wall Street from serious and repeated violations of the law.

d.      Deprivation of a procedural forum.  Because the DOJ never sought any form of judicial review of the $13 Billion Agreement, Better Markets was deprived of a public forum in which it could have exercised its right to seek participation through intervention or *amicus curiae* status.  Better Markets was thus deprived of a uniquely valuable opportunity to press for the judicial compilation of a complete record on which to assess the $13 Billion Agreement, to advocate for a court-approved penalty and other sanctions that would adequately punish and deter JP Morgan Chase, and to influence the settlement process before the agreement became effective.

e.      Threatened exacerbation of the injuries already inflicted.  Because the DOJ intends to use the $13 Billion Agreement as a template for resolving similar potential claims against Wall Street's biggest banks that sold toxic securities leading up to the Financial Crisis, all of the foregoing harms will be perpetuated and compounded, further interfering with the activities of Better Markets and draining its resources.

## COUNT ONE:

### THE DOJ VIOLATED THE SEPARATION OF POWERS DOCTRINE

104.    Plaintiff incorporates by reference all the allegations of the preceding paragraphs.

105.    By entering the $13 Billion Agreement without filing a lawsuit and seeking judicial review and approval, the DOJ violated the separation of powers doctrine, and its actions were "contrary to constitutional right, power, privilege, or immunity" within the meaning of Section 706(2)(B) of the APA.

106.    The Plaintiff is therefore entitled to relief under Section 702 of the APA.

## COUNT TWO:

### THE DOJ ACTED IN EXCESS OF ITS STATUTORY AUTHORITY

107.    Plaintiff incorporates by reference all the allegations of the preceding paragraphs.

108.    Because the DOJ entered the $13 Billion Agreement and obtained sanctions without statutory authority, including, without limitation, the FIRREA penalty, the DOJ acted "not in accordance with law" and "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," within the meaning of meaning of Sections 706(2)(A) and (C) of the APA.

109.    The Plaintiff is therefore entitled to relief under Section 702 of the APA.

## COUNT THREE:

### THE DOJ'S ACTIONS WERE ARBITRARY AND CAPRICIOUS

110.    Plaintiff incorporates by reference all the allegations of the preceding paragraphs.

111.    By entering the $13 Billion Agreement without filing a case and seeking judicial review and approval under the extraordinary circumstances detailed above, the DOJ's actions

were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," within the meaning of meaning of Section 706(2)(A) of the APA.

112.   In addition, by declaring its intention to use the $13 Billion Agreement as a template in future cases involving the handful of the largest too-big-to-fail Wall Street banks that caused or significantly contributed to the Financial Crisis, the DOJ has adopted an enforcement policy that represents an abdication of its responsibility to enforce the law aggressively, transparently, and in accordance with the Constitution and laws of the United States.

113.   The Plaintiff is therefore entitled to relief under Section 702 of the APA.

## COUNT FOUR:

## THE DOJ VIOLATED FIRREA BY UNILATERALLY EXTRACTING A $2 BILLION PENALTY WITHOUT A COURT ASSESSMENT OR APPROVAL

114.   Plaintiff incorporates by reference all the allegations of the preceding paragraphs.

115.   By entering into the $13 Billion Agreement, which incorporated a penalty pursuant to 12 U.S.C. § 1833a, without any court involvement in assessing the penalty, the DOJ violated the explicit statutory requirements of FIRREA.

116.   The DOJ's actions were "arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with law;" "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;" and "without observance of procedure required by law," within the meaning of Sections 706(2)(A), (C), and (D) of the APA.

117.   The Plaintiff is therefore entitled to relief under Section 702 of the APA.

## COUNT FIVE:

## THE DOJ VIOLATED THE APA IN EXTRACTING THE $2 BILLION PENALTY

118.   Plaintiff incorporates by reference all the allegations of the preceding paragraphs.

119.    By entering into the $13 Billion Agreement and extracting a $2 billion civil penalty without complying with the explicit requirements of FIRREA, and by extracting other monetary sanctions without authority, the DOJ also violated the APA, which provides that "[a] sanction may not be imposed or a substantive rule or order issued except within jurisdiction delegated to the agency and **as authorized by law.**"  5 U.S.C. § 558(b) (emphasis added); *see also* 5 U.S.C. § 551 ("Sanction" includes the "imposition of a penalty.").

120.    The DOJ's actions were therefore "arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with law;" "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;" and "without observance of procedure required by law;" within the meaning of Sections 706(2)(A), (C), and (D) of the APA.

121.    The Plaintiff is therefore entitled to relief under Section 702 of the APA.

## COUNT SIX:

## BETTER MARKETS IS ENTITLED TO INJUNCTIVE RELIEF

122.    Plaintiff incorporates by reference all the allegations of the preceding paragraphs.

123.    Better Markets is suffering and will continue to suffer irreparable injury absent injunctive relief.  As detailed above, by virtue of the actions complained of herein, the DOJ is interfering with the ability of Better Markets to pursue its advocacy activities; forcing Better Markets to expend resources to counteract the harmful effects of the DOJ's unlawful $13 Billion Agreement; and depriving Better Markets of a judicial forum in which it could have sought, and if granted relief will be able to seek, to influence the settlement process and the reviewing court's evaluation of the $13 Billion Agreement.  These injuries will intensify as the DOJ uses the $13 Billion Agreement as a template, and follows the same unacceptable settlement procedure in

future cases.  Moreover, none of these injuries is compensable through any means other than the injunctive relief sought.

124.    The balance of hardships favors Better Markets, in that the injuries that Better Markets is suffering and will continue to suffer absent injunctive relief outweigh the DOJ's interest in preserving an unlawful settlement that was procured through a violation of the separation of powers doctrine and other federal law and that has not been determined by a court to be in the public interest.  Moreover, the DOJ may still effectuate the $13 Billion Agreement, provided it can persuade a court, upon compilation of an adequate record, that the terms are adequate under the applicable standard of review.  If the DOJ cannot make such a showing, and cannot obtain approval for the $13 Billion Agreement, that failure would not be a cognizable burden for purposes of balancing the hardships of the parties.  Such harm would result not from the imposition of injunctive relief, but from the determination that the $13 Billion Agreement fails to meet the applicable legal standard.

125.    Finally, the public interest strongly supports granting the requested injunction. The primary purpose of the injunction will be to protect the public interest in seeing that officers of the United States comply with the law; that a settlement in an extraordinarily important matter is subjected to an independent review by a court to ensure that it serves the public interest; and to protect the public's right to judge the $13 Billion Agreement for itself, on the basis of a full and transparent record.

126.    Better Markets is therefore entitled to injunctive relief.

## COUNT SEVEN:

## BETTER MARKETS IS ENTITLED TO DECLARATORY RELIEF

127.    Plaintiff incorporates by reference all the allegations of the preceding paragraphs.

128.     As alleged above, and by virtue of the actions complained of herein, a definite, concrete, and substantial dispute exists between the DOJ and Better Markets concerning the legality and validity of the $13 Billion Agreement.  This dispute is of sufficient immediacy and reality as to warrant a declaratory judgment.

129.     The Plaintiff is therefore entitled to relief pursuant to 28 U.S.C. § 2201(a).

### **PRAYER FOR RELIEF:**

130.     WHEREFORE, Plaintiff prays for an order and judgment:

a.     Declaring, pursuant to the APA and 28 U.S.C. § 2201, that—

i.     By entering the $13 Billion Agreement with JP Morgan Chase without seeking judicial review and approval, under the extraordinary circumstances, the DOJ usurped the adjudicatory role of the judicial branch of government, in violation of the separation of powers doctrine.

ii.     The DOJ lacked statutory authority to enter the $13 Billion Agreement with JP Morgan Chase and extract the relief it did without seeking judicial review and approval, and it therefore acted "not in accordance with law" and "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," within the meaning of Sections 706(2)(A) and (C) of the APA.

iii.     The DOJ's actions in entering the $13 Billion Agreement without judicial review and approval, and in adopting an enforcement policy predicated on the $13 Billion Agreement, were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," within the meaning of meaning of Section 706(2)(A) of the APA.

iv.     The DOJ failed to comply with the explicit requirements of FIRREA, 18 U.S.C. § 1833a(a) and (e), when it recovered the $2 billion civil monetary penalty from JP Morgan Chase without having a court assess or approve that penalty, and its actions were therefore "arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with law;" "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;" and without observance of procedure required by law," within the meaning of Sections 706(2)(A), (C), and (D) of the APA.

v.      The DOJ failed to comply with the explicit requirements of the APA, 5 U.S.C. §  558, when it extracted a $2 billion penalty and other monetary sanctions upon JP Morgan Chase without being authorized by law to do so, and its actions were "arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with law;" "in excess of statutory jurisdiction, authority, or limitations, of short of statutory right"; and without observance of procedure required by law," within the meaning of Sections 706(2)(A), (C), and (D) of the APA.

vi.     The $13 Billion Agreement is unlawful and invalid in whole or in part.

b.      Permanently enjoining the DOJ from enforcing the $13 Billion Agreement unless and until the DOJ submits the $13 Billion Agreement to a court so that such court may review all the facts and circumstances, enlarge the record supporting the $13 Billion Agreement as it deems necessary, and determine whether the $13 Billion Agreement meets the applicable legal standard of review.

      c.      Awarding Plaintiff its reasonable costs, including attorneys' fees, incurred in bringing this action; and

      d.      Granting such other and further relief as this Court deems just and proper.

Respectfully submitted,

/s/ Dennis M. Kelleher
Dennis M. Kelleher, D.C. Bar No. 1009682
dkelleher@bettermarkets.com
Stephen W. Hall, D.C. Bar No. 366892
shall@bettermarkets.com
Better Markets, Inc.
1825 K Street, N.W., Suite 1080
Washington, D.C.  20006
Tel: 202-618-6464
Fax: 202-618-6465

Attorneys for Plaintiff

Dated:  February 10, 2014