## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

BETTER MARKETS, INC.
1825 K Street, N.W., Suite 1080
Washington, D.C.  20006

                Plaintiff,

   v.

UNITED STATES DEPARTMENT          Civil Action No. 1:14-CV-00190 (BH)
OF JUSTICE and ERIC H. HOLDER, JR.,
in his official capacity as Attorney
General of the United States,
950 Pennsylvania Avenue, N.W.
Washington, D.C.  20530-0001

                Defendants.

## PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES
## IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Better Markets, Inc.
Dennis M. Kelleher
D.C. Bar No. 1009682
Stephen W. Hall
D.C. Bar No. 366892
1825 K Street, N.W., Suite 1080
Washington, D.C. 20006
Tel: 202-618-6464
Dkelleher@bettermarkets.com
Better Markets, Inc.
1825 K Street, N.W., Suite 1080
Washington, D.C. 20006

Dated:  July 7, 2014

### TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................... iv

INTRODUCTION ...................................................................................................1

ARGUMENT ..........................................................................................................6

I.     THE COURT HAS SUBJECT-MATTER JURISDICTION OVER THIS CASE ............6

     A.     This Court has jurisdiction to hear Better Markets' claim that DOJ
           violated FIRREA ................................................................................7

           1.     The APA establishes a strong presumption of reviewability, which
                 DOJ has failed to overcome ......................................................8

           2.     FIRREA's plain language, relevant case law, and legislative history
                 show that Congress imposed limits on DOJ's discretion...........................9

           3.     DOJ's authorities are inapplicable ...........................................14

     B.     This Court also has jurisdiction to hear Better Markets' constitutional
           claims ............................................................................................16

           1.     The separation of powers doctrine preserves and protects the role of
                 each branch of government, including the judicial branch ......................17

            2.     Better Markets has pled a colorable claim that DOJ improperly
                 usurped the power to assess penalties under FIRREA, something
                 Congress reserved to the judicial branch ...................................19

           3.     Better Markets also has pled a colorable claim that DOJ violated the
                 separation of powers doctrine by failing to seek court involvement,
                 entirely apart from any putative settlement authority DOJ may
                 claim............................................................................................20

II.     BETTER MARKETS HAS ARTICLE III STANDING ....................................23

     A.     Better Markets has suffered the type of legally cognizable injury recognized in
           *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) .......................24

           1.     The Complaint alleges conflict with Better Markets' mission .................26

           2.     The Complaint alleges impairment of Better Markets' ability to pursue
                 its activities ...............................................................................27

a.      Lack of judicial assessment ...........................................................28

b.      Lack of information that would be available in a complaint
and related filings..........................................................................28

c.      Inability to assess and correct misinformation .............................29

3.      The Complaint alleges that Better Markets has had to expend
resources to counteract the harmful effects of DOJ's failure to
seek judicial review and approval of the Settlement .................................30

B.      Better Markets has informational standing............................................................33

C.      Better Markets has procedural standing.................................................................35

D.      Imminence, causation, and redressability are also present ....................................38

III.      DISMISSAL UNDER RULE 19 IS UNWARRANTED ....................................................41

A.      Under the public rights exception, JP Morgan and the States need not be
joined.....................................................................................................................41

B.      Even under a traditional Rule 19 analysis, dismissal would be inappropriate.......43

CONCLUSION....................................................................................................................44

## TABLE OF AUTHORITIES

**CASES**

*Abigail Alliance v. Von Eschenbach,*
469 F.3d 129 (D.C. Cir. 2006) ...........................................................................24, 25, 40

*Action Alliance of Senior Citizens v. Heckler,*
789 F.2d 931 (D.C. Cir. 1986) ........................................................................................38

*American Bus Ass'n v. Slater,*
231 F.3d 1 (D.C. Cir. 2000) ...........................................................................10, 11, 12, 15

*\*ASPCA v. Feld Entm't, Inc.,*
659 F.3d 13 (D.C. Cir. 2011) .................................................................................. *passim*

*Association of Data Processing Serv. Orgs., Inc. v. Camp,*
397 U.S. 150 (1970) ........................................................................................................41

*Association of Irritated Residents v. EPA,*
494 F.3d 1027 (D.C. Cir. 2007) ................................................................................14, 15

*Baltimore Gas & Elec. Co. v. FERC,*
252 F.3d 456 (D.C. Cir. 2001) ...........................................................................13, 14, 15

*Bell v. Hood,*
327 U.S. 678 (1946) ..........................................................................................................7

*Bond v. U.S.,*
131 S. Ct. 2355 (2011) ....................................................................................................41

*Bragg v. Robertson,*
54 F. Supp. 2d 653 (S.D. W. Va. 1999) ..........................................................................22

*Burnside-Ott Aviation Training Ctr. v. Dalton,*
107 F.3d 854 (Fed. Cir. 1997) .........................................................................................20

*C C Distribs. Inc. v. U.S.,*
883 F. 2d 146 (D.C. Cir. 1989) .......................................................................................37

*Center for Law & Educ. v. Dep't of Educ.,*
396 F.3d 1152 (D.C. Cir. 2005) ................................................................................37, 39

*Chao v. Day,*
436 F.3d 234 (D.C. Cir. 2006) ..........................................................................................9

*Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of the Treas.*,
  2014 U.S. Dist. LEXIS 24885 (D.D.C. Feb. 27, 2014) .................................................23

*City of Dania Beach v. FAA*,
  485 F.3d 1181 (D.C. Cir. 2007) ...........................................................................35, 37

*City of Waukesha v. EPA*,
  320 F.3d 228 (D.C. Cir. 2003) ............................................................................24

*Commodity Futures Trading Comm'n v. Schor*,
  478 U.S. 833 (1986)..........................................................................................18

*Competitive Enter. Inst. v. NHTSA*,
  901 F.2d 107 (D.C. Cir. 1990) ...........................................................................38

*COMSAT Corp. v. FCC*,
  114 F.3d 223 (D.C. Cir. 1997) .......................................................................13, 14

*Conner v. Burford*,
  848 F.2d 1441 (9th Cir. 1988) ...........................................................................43

*Cook v. FDA*,
  733 F.3d 1 (D.C. Cir. 2013) ................................................................................9

*Crowell v. Benson*,
  285 U.S. 22 (1932)...........................................................................................17

*Delta Air Lines, Inc. v. Ex-Im Bank of the U.S.*,
  718 F.3d 974 (D.C. Cir. 2013) ...................................................................8, 12, 13

*Disability Law Ctr. v. Mass. Dep't of Corr.*,
  2012 U.S. Dist. LEXIS 51312 (D. Mass. Apr. 12, 2012) ................................................22

*Doe v. Cheney*,
  885 F.2d 898 (D.C. Cir. 1989) ...........................................................................16

*EEOC v. Nat'l Children's Ctr., Inc.*,
  98 F.3d 1406 (D.C. Cir. 1991) ...........................................................................33

*Equal Rights Ctr. v. Post Props.*,
  633 F.3d 1136 (D.C. Cir. 2011) .....................................................................23, 28

*Ethyl Corp. v. EPA*,
  306 F.3d 1144 (D.C. Cir. 2002) ................................................................32, 34, 35

*FDA v. Brown & Williamson*,
   529 U.S. 120 (2000).................................................................................19

*\*FEC v. Akins*,
   524 U.S. 11 (1998).............................................................................27, 34

*\*Havens Realty Corp. v. Coleman*,
   455 U.S. 363 (1982)........................................................................ *passim*

*Heckler v. Chaney*,
   470 U.S. 831 (1985)........................................................................ *passim*

*The Herero People's Reparations Corp. v. Deutsche Bank*,
   370 F.3d 1192 (D.C. Cir. 2004) ...........................................................7

*Hondros v. U.S. Civil Serv. Comm'n*,
   720 F.2d 278 (3d Cir. 1983)..................................................................16

*In re Aiken Cty.*,
   725 F.3d 255 (D.C. Cir. 2013) ...............................................................8

*In re Guidant Corp. Implantable Defibrillators Products Liab. Litig.*,
   2008 U.S. Dist. LEXIS 17535 (D. Minn. Mar. 7, 2008)....................21

*In re Vioxx Products Liab. Litig.*,
   574 F. Supp. 2d 606 (E.D. La. 2008) ..................................................21

*\*In re Zyprexa Products Liab. Litig.*,
   433 F. Supp. 2d 268 (E.D.N.Y. 2006) .................................................21

*In re Zyprexa Products Liab. Litig.*,
   424 F. Supp. 2d 488 (E.D.N.Y. 2006) .................................................21

*Journal of Commerce, Inc. v. U.S. Dep't of Treas.*,
   1988 U.S. Dist. LEXIS 17610 (D.D.C. Mar. 30, 1988)....................20

*Kaiser Steel Corp. v. Mullins*,
   455 U.S. 72 (1982).................................................................................19

*Kucana v. Holder*,
   130 S. Ct. 827 (2010).............................................................................18

*Lepelletier v. FDIC*,
   164 F.3d 37 (D.C. Cir. 1999) ...............................................................39

*Lujan v. Defenders of Wildlife,*
  504 U.S. 555 (1992)............................................................................24, 35, 39, 41

*Makah v. Verity,* 910 F2d 555 (9th Cir. 1990)..............................................................43

*Metropolitan Wash. Airports Auth. v. Citizens for Abatement of Aircraft Noise,*
  501 U.S. 252 (1991).......................................................................................17

*Motor & Equip. Mfrs. Ass'n v. Nichols,*
  142 F.3d 449 (D.C. Cir. 1998).......................................................................39

*Naartex Consulting Corp. v. Watt,*
  722 F.2d 779 (D.C. Cir. 1983).......................................................................43

*National Licorice Co. v. Nat'l Labor Relations Bd.,*
  309 U.S. 350 (1940).................................................................................41, 43

*National Taxpayers Union, Inc. v. U.S.,*
  68 F.3d 1428 (D.C. Cir. 1995).......................................................................31

*National Wildlife Fed'n v. Burford,*
  676 F. Supp 271 (D.D.C. 1985).....................................................................42

*National Wildlife Fed'n v. EPA,*
  980 F.2d 765 (D.C. Cir. 1992).........................................................................9

*Natural Res. Def. Council v. Berklund,*
  458 F. Supp. 925 (D.D.C. 1978).....................................................................42

*Nixon v. Warner Communications,*
  435 U.S. 589 (1978).......................................................................................33

*Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.,*
  458 U.S. 50 (1982).........................................................................................17

*NY State Dep't of Law v. FCC,*
  984 F.2d 1209 (D.C. Cir. 1993).................................................................14, 15

*Performance Coal Co. v. Fed. Mine Safety & Health Review Comm'n,*
  642 F.3d 234 (D.C. Cir. 2011).........................................................................9

*Public Citizen v. Dep't of Justice,*
  491 U.S. 440 (1989).......................................................................................33

*Railway Labor Exec. Ass'n v. Nat'l Mediation Bd.,*
  29 F.3d 655 (D.C. Cir. 1994).........................................................................19

*Ramah Navajo Sch. Bd., Inc. v. Babbitt*,
    87 F.3d 1338 (D.C. Cir. 1996) ......................................................................13

*Robbins v. Reagan*,
    780 F.2d 37 (D.C. Cir. 1985) ..........................................................................8

*Safari Club Int'l v. Jewell*,
    960 F. Supp. 2d 17(D.D.C. 2013) ..................................................................38

*Safari Club Int'l v. Salazar*,
    281 F.R.D. 32 (D.D.C. 2012)...........................................................................35

*Schering Corp. v. Heckler*,
    779 F.2d 683 (D.C. Cir. 1985) ................................................................14, 15

*SEC v. Citigroup Global Mkts., Inc.*,
    2014 U.S. App. LEXIS 10516 (2d Cir. 2014) ................................15, 21, 36, 37

*Sierra Club v. Watt*,
    608 F. Supp. 305 (E.D. Cal 1985)...................................................................42

*State of Mich. v. EPA*,
    268 F.3d 1075 (D.C. Cir. 2001) .....................................................................19

*Steel Co. v. Citizens for Better Env't*,
    523 U.S. 83 (1998).............................................................................................7

*Spann v. Colonial Vill., Inc.*,
    899 F.2d 24 (D.C. Cir. 1990)....................................................25, 29, 30, 32

*Swift & Co. v. United States*,
    276 U.S. 311 (1928)........................................................................................15

*Swomley v Watt*,
    526 F. Supp. 1271 (D.D.C. 1981) ..................................................................41

*Transamerica Mortgage Advisors, Inc. v. Lewis*,
    444 U.S. 11 (1979)..........................................................................................14

*United States v. Haun*,
    124 F.3d 745 (6th Cir. 1997) ...................................................................11, 12

*United States v. Hercules, Inc.*,
    961 F.2d 796 (8th Cir. 1992) .........................................................................15

*United States v. Menendez,*
    2013 U.S. Dist. LEXIS 39584 (C.D. Cal. Mar. 6, 2013) ............................................10, 34

*United States v. Meisinger,*
    2011 U.S. Dist. LEXIS 116706 (C.D. Cal. Aug. 26, 2011) ............................................10

*United States v. Microsoft,*
    56 F.3d 1448 (D.C. Cir. 1995) ...............................................................................23

*United States v. Students Challenging Regulatory Agency Procedures,*
    412 U.S. 669 (1973) .............................................................................................27

*\*Webster v. Doe,*
    486 U.S. 592 (1988) .............................................................................................16

*Wells Fargo Bank, N.A. v. FDIC,*
    367 F.3d 953 (D.C. Cir. 2004) ...............................................................................12

*Western Wood Preservers Inst. v. McHugh,*
    925 F. Supp. 2d 63 (D.D.C. 2013) ..........................................................................4

*Youngstown Sheet & Tube Co. v. Sawyer,*
    343 U.S. 579 (1952) .............................................................................................17

**RULES**

Federal Rule of Civil Procedure 19 ........................................................................ *passim*

Federal Rule of Civil Procedure 23 ........................................................................20

Federal Rule of Civil Procedure 66 ........................................................................20

Rules of the United States District Court for the District of Columbia,
    LCvR 5.1(h)(1) ...................................................................................................33

**STATUTES**

5 U.S.C. §§ 701 .................................................................................................8

7 U.S.C. § 203 .................................................................................................11

15 U.S.C. § 717t-1 ............................................................................................15

28 U.S.C. § 1331 ..........................................................................................6, 7, 20

28 C.F.R. § 50.9 ...............................................................................................33

42 U.S.C. §§ 7413, 9609, *et seq.*.................................................................................10, 15

47 U.S.C. § 503.................................................................................................................15

*Financial Institutions Reform, Recovery and Enforcement Act of 1989,*
    12 U.S.C. §1833a ................................................................................... *passim*

Tunney Act,
    15 U.S.C. § 16(e)(1)...............................................................................10, 21

## OTHER

House Report, No 101-54, Part 1 (May 16, 1989), 465-466 ...................................12, 41

Ingram, David & Aruna Viswanatha, *Exclusive: U.S. Plans New Bank Fraud*
    *Cases in Early 2014 – Attorney General*, Business & Financial News,
    Breaking US & International News, Reuters.com,
    http://www.reuters.com/assets/print?aid=USBRE9B30RZ20131204,
    Dec. 4, 2013 ...........................................................................................................38

Jones, Allie, *It's Official: JPMorgan Owes the Justice Department $13 Billion*,
    Atlantic Monthly, The Wire, Nov. 19, 2013.........................................................38

2-12 MOORE'S FEDERAL PRACTICE—Civil § 12.35....................................................43

*Prosecuting Fraud in the Thrift Industry: Hearings before the Subcommittee*
    *on Criminal Justice of the Committee on the Judiciary, House of*
    *Representatives*, One Hundred First Congress, First Session,
    Mar. 22 & 23, 1989, pgs. 303, 304 .......................................................................12

Senate Report, No. 101-19, §1001 (Apr. 13, 1989)........................................................12

*The people versus Wall Street banks*, FINANCIAL TIMES, Feb. 11, 2014 (Editorial) ......................5

## INTRODUCTION

Plaintiff Better Markets, Inc. ("Better Markets") respectfully opposes the Motion to Dismiss ("Motion" or "Motion to Dismiss") filed by Defendants United States Department of Justice and Eric H. Holder, Jr., in his official capacity as Attorney General of the United States (together, "DOJ").

The question presented in this case is whether the Executive Branch, under the Constitution and laws of the United States, has the unlimited, unilateral, and unreviewable power to act without transparency, oversight, or accountability in settling an historic case for a record-setting amount in a matter that affects every man, woman, and child in the country. The answer to that question is "no" and can be found in the Constitution's separation of powers doctrine, which requires that the exercise of such power be subjected to appropriate checks and balances. The answer is even clearer here, where Congress has explicitly required the Executive Branch to involve the judiciary in seeking penalties for wrongdoing, as it has in the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), 12 U.S.C. § 1833a.

The facts and circumstances of this case are unique: the Executive Branch granted blanket civil immunity to the largest bank in the United States, JP Morgan Chase ("JP Morgan"), in exchange for $13 billion for its role in causing the worst financial crash since 1929 and the worst economic catastrophe since the Great Depression of the 1930s. Compl. ¶¶ 2, 8, 21, 95. Indeed, but for the extraordinary actions of the U.S. government, including the use of trillions of dollars in bailouts and emergency financial rescue programs, the actions settled here would have contributed to the collapse of the global financial system and a second Great Depression.

The costs of the crash and economic crisis, which continue to inflict misery on tens of millions of Americans today, will exceed $13 trillion and may be many multiples of that.

1

Indeed, the costs to the U.S. alone are estimated to reach as much as $120,000 for every living man, woman, and child in this country. *Id.* ¶ 2. And that is only the dollar cost, not the unquantifiable suffering of tens of millions of American families who have had to live through unemployment, loss of health care, foreclosures, under-water homes, loss of savings, inability to retire, and the persistent, gnawing economic insecurity that continues to wreak havoc on many communities and families across the land. *Id.* ¶ 95.

Yet, the Executive Branch, acting alone and behind closed doors, negotiated and agreed to a settlement with the largest, most powerful, and most politically connected bank in the U.S. for what appears to be egregious and widespread illegal conduct contributing to that crash, crisis, pain, and suffering ("Settlement" or "Agreement").  Not only was this done unilaterally, but the structure of the settlement prevented transparency, oversight, and accountability, not only of the illegal conduct of JP Morgan, but  also of the conduct of the Executive Branch in enforcing the law: No one—no court, no watchdog group, and most importantly, no member of the public— has sufficient meaningful information to determine if this was a backroom, sweetheart, sellout settlement for a politically connected bank and public relations purposes or a tough-as-nails enforcement action that should make the American people proud. *Id.* ¶¶ 10, 11, 17.

In substance, the Executive Branch in this case acted unilaterally as investigator, prosecutor, judge, jury, sentencer, and fine collector. *Id.* ¶ 7. While that may be acceptable in the many matters, large and small, that the Executive Branch and DOJ handle routinely, that simply is not appropriate under the unique facts and circumstances of this case, as alleged in the Complaint:

1.    THE HISTORIC CLAIMS: The Agreement resolved claims of pervasive fraud that contributed to the worst financial crash since 1929 and the worst economy since the Great Depression of the 1930s. *Id.* ¶¶ 2; 47(c), (j); 95.

2.    THE LARGEST SETTLEMENT AMOUNT EVER: The Settlement amount was the largest in the 237-year history of the United States with any single entity by more than 300 percent. *Id.* ¶¶ 4, 47(a).

3.    THE LARGEST FIRREA PENALTY EVER: The FIRREA penalty was the largest in history by more than 12,000 percent. *Id.* ¶ 5.

4.    THE BIGGEST BANK: JP Morgan is the largest, richest, and most well-connected Wall Street bank in the U.S. *Id.* 47(d).

5.    THE HIGHEST-LEVEL NEGOTIATORS: The Attorney General and other senior DOJ political appointees negotiated directly and entirely in secret with the CEO of JP Morgan, someone who was considered a possible Treasury Secretary just a few years ago. *Id.* ¶¶ 20, 47(e).

6.    THE $10 BILLION PHONE CALL: Just before a complaint was about to be filed against JP Morgan, the cellphone of DOJ's third highest ranking official rang with the "familiar" phone number of JP Morgan's CEO. He was calling to offer billions of dollars to stop DOJ from holding a press conference and filing the lawsuit that was hours away. The call worked, the press conference and lawsuit were both called off, and $10,000,000,000 more was handed over. *Id.* ¶¶ 19; 47(g), (h); 74.

7.    THE UNPRECEDENTED AGREEMENT: DOJ gave complete civil immunity to JP Morgan for defrauding an untold number of investors in exchange for $13

billion, via a contract that was negotiated and finalized in secret without any review or approval by a federal court. *Id.* 47(i).

The Executive Branch and DOJ have repeatedly trumpeted only one of these key facts: the settlement amount of $13 billion. But, a dollar amount, no matter how large, is meaningless by itself. Without transparency, oversight, and accountability, it is impossible to determine whether and to what extent such an amount will have any real impact in punishing, deterring, or remediating fraud. Here, that critical transparency, oversight, and accountability are missing. DOJ failed to disclose, for example:

1.     THE LOSSES: How much did JP Morgan's clients, customers, counterparties, investors, and others lose as a result of its fraudulent conduct? $100 billion? $200 billion? More? *Id.* ¶ 67(e).

2.     THE PROFITS: How much revenue, profits, and other benefits did JP Morgan receive as a result of its fraudulent conduct, and was it all disgorged? $10 billion? $20 billion? More? *Id.* ¶¶ 11, 67(f).

3.     THE BONUSES: Who received what amount of bonuses for the illegal conduct? *Id.* ¶ 67(c), (f).

4.     THE FRAUD: What are the material facts of the illegal conduct by JP Morgan and the specific violations of law that were committed? *Id.* ¶ 67(b), (d).

5.     THE CULPRITS: What exactly did the individual executives, officers, managers, and employees involved in the illegal conduct actually do to carry out the fraud, and what consequences, if any, have they had to accept for their role? *Id.* ¶ 67(c).

6.     THE CORRECTIVE ACTION: Why did the contract fail to impose on JP Morgan any obligation to change any of its business or compliance practices, which are

standard conduct remedies that regulators routinely require? And how can the sanctions effectively punish and deter JP Morgan, given its wealth and its extensive history of lawless conduct? *Id.* ¶ 67(g), (h), (k).

7. <u>THE LACK OF ADMISSIONS:</u>  Why are there no admissions of fact or law by JP Morgan, and what, if any, are the concrete legal implications of their so-called "acknowledgment," other than misleading many to think that JP Morgan actually "admitted" the allegations? *Id.* ¶¶ 67(m), 68-72.

In addition, there was no review of the Settlement by a federal court. As a result, the public is uninformed and in the dark about such historic matters and utterly unable to evaluate the conduct of its government or its repeated claims about the Settlement. As an editorial in the Financial Times put it, "Justice may or may not have been done; it has certainly not been seen to be done." *The people versus Wall Street banks*, FINANCIAL TIMES, Feb. 11, 2014 (Editorial). Making matters worse, the Executive Branch intends to use this Settlement as a "template" for settlements with the five or so other too-big-to-fail Wall Street banks that, together, were largely responsible for the financial crash and economic calamity (out of almost 7,000 banks in the U.S.). Compl. ¶¶ 21, 47(l). Thus, within a short period of time, the Executive Branch intends to extinguish, unilaterally and largely in secret, all civil liability of the largest banks in the U.S. for nearly causing a second Great Depression.

The sweeping, unreviewable, and unilateral power claimed by the Executive Branch here is as extreme as it is unprecedented: it is claiming that it alone has the power to settle any matter of any type on any terms, regardless of the scope and gravity of the misconduct and the consequences for the country, without any judicial review ever. Under this view of the law, the Executive Branch could grant blanket civil (and even criminal) immunity to Wall Street's six

biggest banks, and all of their executives and officers, for causing the worst financial crash and economic crisis in almost 100 years, for a dime—and no court could review its actions. Such a concentration of unreviewable power is impermissible in a constitutional democracy based on the rule of law, the informed consent of the governed, and checks and balances.

## ARGUMENT

The Court should deny DOJ's Motion to Dismiss for three reasons. First, this Court has federal question jurisdiction because Better Markets has made colorable claims that DOJ violated FIRREA, the Administrative Procedures Act ("APA"), and the U.S. Constitution when it entered the Settlement entirely outside the purview of the courts. The presumption against reviewability established by *Heckler v. Chaney*, 470 U.S. 821 (1985), does not control because FIRREA provides law to apply in evaluating DOJ's actions. Further, federal courts have jurisdiction to hear colorable constitutional claims, even as to agency actions otherwise considered discretionary.

Second, the Complaint's allegations, which must be accepted as true, sufficiently plead Better Markets' constitutional and prudential standing.

Third, under the "public rights" doctrine, as well a traditional analysis under Federal Rule of Civil Procedure 19, there are no indispensable parties to this litigation who have yet to be joined.

For all of the foregoing reasons, discussed in further detail below, DOJ's Motion should be denied.

## I.    THE COURT HAS SUBJECT-MATTER JURISDICTION OVER THIS CASE.

This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 because Better Markets has alleged claims under federal law, including violations of FIRREA and the separation

of powers doctrine. Such claims should not be dismissed for want of subject-matter jurisdiction unless they are "immaterial and made solely for the purpose of obtaining jurisdiction" or "wholly insubstantial and frivolous." *Bell v. Hood*, 327 U.S. 678, 682-683 (1946). That is, "the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction, *i.e.*, the courts' statutory or constitutional *power* to adjudicate the case." *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 89 (1998) (emphasis in original). Thus, "[d]ismissal for lack of subject-matter jurisdiction because of the inadequacy of the federal claim is proper only when the claim is 'so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as not to involve a federal controversy.'" *Id.* (internal citations omitted); *see also The Herero People's Reparations Corp. v. Deutsche Bank, A.G.*, 370 F.3d 1192, 1194 (D.C. Cir. 2004) (same).

The question at this preliminary stage, then, is whether Better Markets has raised at least colorable claims that arise "under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. Better Markets has met this liberal standard and dismissal is therefore unwarranted.

A.  This Court has jurisdiction to hear Better Markets' claim that DOJ violated FIRREA.

Better Markets alleges that DOJ recovered a monetary penalty from JP Morgan without filing a civil action and without seeking a judicial assessment of the penalty, in violation of FIRREA. Compl. ¶¶ 78-72. DOJ does not dispute that this issue involves federal law, but contends that the Court lacks jurisdiction because Better Markets is in fact challenging a discretionary agency decision to settle, which may not be reviewed by a court under *Chaney*. DOJ is incorrect. There is a strong presumption of reviewability of federal agency action, and DOJ has failed to overcome that presumption. The immunity from judicial review recognized in

*Chaney* does not apply—or is rebutted—whenever Congress has imposed requirements or limits on an agency's enforcement discretion, as it has in FIRREA.

      1.        <u>The APA establishes a strong presumption of reviewability, which DOJ has failed to overcome.</u>

Under the APA, there is a "strong presumption of *reviewability* of typical agency action[.]" *Robbins v. Reagan*, 780 F.2d 37, 45 (D.C. Cir. 1985) (*per curiam*) (emphasis added); *see also Delta Air Lines, Inc. v. Ex-Im Bank of the U.S.*, 718 F.3d 974, 976 (D.C. Cir. 2013) (same). Review is *unavailable* "when agency action is committed to agency discretion by law." *Delta Air Lines*, 718 F.3d at 976; *see also* 5 U.S.C. § 701(a)(2). However, this exception to the presumption of reviewability is "very narrow" and applies only in those rare instances where a statute is "drawn in such broad terms that in a given case there is no law to apply." *Chaney*, 470 U.S. at 830 (internal citation and quotation omitted); *In re Aiken Cty*, 725 F.3d 255, 266 (D.C. Cir. 2013) (Kavanaugh, J., separate section of op.) (prosecutorial discretion does not encompass agency decision not to follow laws imposing mandates or prohibitions on the Executive Branch).[1]

DOJ bears the burden of showing that its action was committed to agency discretion by law. *See Delta Air Lines*, 718 F.3d at 977 (finding that, because Ex-Im Bank failed to show that the governing statute was drawn in such broad terms that there was no "law to apply," it did not overcome APA's presumption of reviewability). Here, DOJ has failed to overcome the presumption of reviewability because there is law to apply: FIRREA requires monetary penalties to be assessed by a court.[2]

---

[1] Even "agency refusals to institute investigative or enforcement proceedings" fall outside an agency's unfettered discretion where Congress has so indicated. *Chaney*, 470 U.S. at 838.

[2] Courts sometimes reach the same result by concluding that, even if a presumption of unreviewability applies, it has been rebutted because Congress has established guidelines for the

> ## 2.  FIRREA's plain language, relevant case law, and legislative history show that Congress imposed limits on DOJ's discretion.

The interpretation of any statute begins with its plain language. *Chao v. Day*, 436 F.3d 234, 235 (D.C. Cir. 2006). A court "must presume that a legislature says in a statute what it means and means in a statute what it says there." *Performance Coal Co. v. Fed. Mine Safety & Health Review Comm'n*, 642 F.3d 234, 238 (D.C. Cir. 2011) (internal citation and quotation omitted). A court should not "muddy" a clear statute "by finding ambiguity where none exists." *Id.* at 239.

Sections 1833a(a) and (e) of FIRREA, 12 U.S.C. § 1833a, are plain. Section (e) provides that "[a] civil action to recover a civil penalty under this section shall be commenced by the Attorney General." This provision means that a *civil* action (not an *administrative* action) to recover a FIRREA civil penalty must be commenced by the Attorney General.

Section (a) provides that, "[w]hoever violates any provision of law to which this section is made applicable by subsection (c) shall be subject to a civil penalty in an amount assessed by the court in a civil action under this section."  This provision means that, to the extent DOJ seeks a civil penalty under FIRREA, a *court* (not the Executive Branch) must assess the penalty in the civil action commenced by the Attorney General. In short, FIRREA does not give DOJ discretion to impose the civil penalty administratively in a settlement but instead mandates that DOJ recover such penalty judicially.

---

agency to follow when exercising its discretion. The D.C. Circuit has minimized the distinction by holding that statutes have **either** made *Chaney* inapplicable **or** rebutted the presumption of unreviewability. *See Cook v. FDA*, 733 F.3d 1, 7-9 (D.C. Cir. 2013); *National Wildlife Fed'n v. EPA*, 980 F.2d 765, 773-774 (D.C. Cir. 1992). Here too, *Chaney* is either inapplicable because FIRREA provides "law to apply" or rebutted because FIRREA provides mandatory "guidelines" for enforcement.

DOJ itself has argued, and a court has agreed, that the plain language of Section 1833a(a) requires a court to assess a FIRREA civil penalty. In *United States v. Meisinger*, 2011 U.S. Dist. LEXIS 116706 (C.D. Cal. Aug. 26, 2011), the defendant asserted that the maximum civil penalty allowed under FIRREA violated the Excessive Fines Clause of the Constitution's Eighth Amendment. *Id.* at *13. In its brief, DOJ argued that the Excessive Fines argument was premature, explaining that "[t]he statute specifically provides that the civil penalty is 'an amount assessed by the court.' 12 U.S.C. § 1833a(a) . . . . Upon evidence of the many fraudulent transactions over a period of years, this Court will assess the appropriate civil penalties against Meisinger . . . . Until then, an Excessive Fines claim is premature." (Case No. 11-00896 (C.D. Cal.), DOJ Opp'n Br., Dkt. 8, at 5). The court agreed with DOJ. *See* 2011 U.S. Dist. LEXIS 116706, at *13-15; *see also United States v. Menendez*, 2013 U.S. Dist. LEXIS 39584, at *15-22 (C.D. Cal. Mar. 6, 2013) (addressing factors that *courts* apply when setting penalties under FIRREA).

Two other cases, including one decided by the D.C. Circuit, also support this interpretation of FIRREA. In *American Bus Association v. Slater*, 231 F.3d 1 (D.C. Cir. 2000), the Department of Transportation ("DOT") argued that the Americans with Disabilities Act ("ADA") provided DOT with authority to impose money damages on bus companies that failed to comply with the ADA. *Id.* at 5. DOT relied upon 42 U.S.C. § 12188(b), which provided that "the Attorney General may commence a civil action in any appropriate United States district court" and allowed a court both to award "monetary damages to persons aggrieved when requested by the Attorney General" and to "assess a civil penalty against the entity[.]" Relying on the plain language of the ADA, the D.C. Circuit rejected DOT's argument, holding that the statute required DOT to obtain such damages in court:

> Congress *unambiguously* intended to preclude DOT from authorizing money damages . . . . Congress did indeed contemplate that money damages would be available – but it also specified the precise conditions under which they could be paid. The monetary relief must be (1) awarded by a court (2) in a civil action (3) that was brought by the Attorney General. By specifying the circumstances under which monetary relief will be available, Congress evinced its intent that damages would be available in no others.

*Id.* at 4-5 (emphasis added).

Similarly, in *United States v. Haun*, 124 F.3d 745 (6th Cir. 1997), the government had filed a civil action, seeking to impose a civil penalty against Haun pursuant to 7 U.S.C. § 203 of the Packers and Stockyards Act, which required livestock dealers to be registered with the Secretary of Agriculture. The statute provided that violators "shall be liable to a penalty of [a certain amount], which shall accrue to the United States and may be recovered in a civil action brought by the United States." *Id.* The trial court dismissed the case, claiming it was "'better handled administratively.'" 124 F.3d at 746. On appeal, however, the Sixth Circuit reversed, holding that a civil penalty under § 203 could not be assessed administratively. *Id.* at 747. The court held:

> To us, the statutory mandate at issue is *entirely clear* – a civil action in the appropriate district court is the exclusive means by which the Secretary can collect a monetary penalty against livestock dealers who operate without having registered in violation of . . . the Act. The statute does not allow for the government to proceed administratively or in any other forum to recover the prescribed penalty; the sole method for recovery of [the] penalty is "a civil action brought by the United States."

*Id.* at 750 (emphasis added).

In FIRREA, as in the statutes applied in *Slater* and *Haun*, Congress specified the conditions under which DOJ may recover a civil penalty: it must be (1) assessed by a court (2) in a civil action (3) brought by the Attorney General. And, because Congress repeatedly used

"shall" in FIRREA, the statute's mandatory nature is even more compelling than it was in *Slater* and *Haun*, where the relevant statutes provided that the government "may" bring a civil action.

FIRREA's legislative history also confirms that the Executive Branch may not obtain a civil penalty extra-judicially. FIRREA, enacted in 1989, represented a landmark change in the wake of the 1980s savings and loan crisis. *See Wells Fargo Bank, N.A. v. FDIC*, 367 F.3d 953, 954 (D.C. Cir. 2004). The law strengthened federal enforcement powers and the penalties for violations of the law. At the time of the Act's passage, there was no question that the civil penalty contemplated in § 1833a would be imposed judicially. In fact, the judicial assessment provision was viewed as an important counterweight to the new "heavy fine" provision. For example, during the hearings on the Act, the American Bankers Association ("ABA") observed that the "ABA does recognize that heavy fines are appropriate enhancements to criminal penalties because they would be *judicially, rather than administratively, imposed . . . .*" Fraud in the Thrift Industry, Hearings before the Subcomm. on Crim. Justice of the Comm. on the Judiciary, House of Rep., 101 Cong., 1st Sess. Mar. 22-23, 1989, at 303-304 (Statement of ABA) (emphasis added).

Further, Congress modified § 1833a(e) to make it mandatory, rather than permissive. Early versions of the subsection provided that the "Attorney General *may* bring a civil action." S. Rep. No. 101-19, §1001 (April 13, 1989) (to accompany S 774) (emphasis added); H. Rep. No. 101-54 Pt. 1 (May 16, 1989) (to accompany HR 1278). The final, enacted version, however, used mandatory language, requiring that the Attorney General "*shall*" commence a civil action to "recover a civil penalty under this section[.]" § 1833a(e). *See Delta Air Lines*, 718 F.3d at 977 (finding that Ex-Im Bank's actions were "subject to judicial review to determine whether the Bank complied with the Bank Act" because the Bank Act mandated that the Ex-Im Bank "shall"

consider certain factors in carrying out its duties); *cf. Baltimore Gas & Elec. Co. v. FERC*, 252 F.3d 456, 461 (D.C. Cir. 2001) (noting that, "[i]f Congress had intended to cabin FERC's enforcement discretion, it could have used obligatory terms such as 'must,' 'shall,' and 'will'").

FIRREA's legislative history thus confirms what the plain language unambiguously shows, that Congress intended to *require* the Attorney General to file a civil action if DOJ wished to recover a FIRREA civil penalty, and Congress further intended a court to assess and impose any such penalty.

In cases where, as here, the plaintiff challenges an agency's failure to follow a mandatory law, the D.C. Circuit has easily found the plaintiff's claim to be reviewable under the APA. In *Delta Air Lines*, for example, the D.C. Circuit rejected Ex-Im Bank's argument that its action was unreviewable as committed to its discretion by law. It so held because the statute at issue mandated (through use of the word "shall") the Bank to consider certain factors when issuing loans and loan guarantees. 718 F.3d at 977. "Ensuring that agencies follow commands of this sort is of course standard judicial fare." *Id.*

Similarly, in *COMSAT Corp. v. FCC*, 114 F.3d 223 (D.C. Cir. 1997), in determining whether the trial court could review an FCC signatory fee imposed on COMSAT, the D.C. Circuit "quickly dispense[d] with the second exception to the presumption of judicial reviewability" because the relevant statute "articulates standards that the Commission must follow in amending the statutory fee schedule[.]" *Id.* at 226; *see also id.* at 227 (statute required that FCC "shall" follow certain standards); *Ramah Navajo School Bd. v. Babbitt*, 87 F.3d 1338, 1343-1349 (D.C. Cir. 1996) (finding plaintiff's claim reviewable because statute did not commit action at issue to agency discretion).

As shown above, FIRREA establishes the procedure that DOJ "shall" follow when seeking the imposition of a FIRREA civil penalty. Hence, under *Delta Air Lines* and *COMSAT*, this Court may review whether DOJ failed to follow the law.

3.     DOJ's authorities are inapplicable.

The cases that DOJ cites, Mot. at 20-21, are distinguishable on several grounds. First, in those cases, the relevant statutes gave the agencies wide discretion in how to enforce the law, whereas here, FIRREA expressly limits the DOJ's discretion. Second, in those cases, the plaintiffs challenged decisions not to take enforcement action[3] or to settle claims. *See Association of Irritated Residents v. EPA*, 494 F.3d 1027, 1031-1033 (D.C. Cir. 2007); *Baltimore Gas*, 252 F.3d at 459-462; *NY State Dep't of Law v. FCC*, 984 F.2d 1209, 1213-1217 (D.C. Cir. 1993); *Schering Corp. v. Heckler*, 779 F.2d 683, 685-687 (D.C. Cir. 1985). Here, by contrast, Better Markets is not arguing that DOJ was required to take enforcement action against JP Morgan, or even that it lacks discretion or authority to seek a settlement in every case. Rather, Better Markets challenges the way in which DOJ settled its claims in this case: DOJ had to but did not file a civil action to collect a FIRREA monetary penalty, which must be assessed by a court *even if* DOJ seeks to settle the matter following the filing of the action. *See Transamerica Mortgage Adv., Inc. v. Lewis*, 444 U.S. 11, 20 (1979) ("where a statute expressly provides a

---

[3] *Chaney* and cases thereafter have recognized that an agency's discretion may be broadest when it decides whether to take any enforcement action at all, whereas once an agency decides to act, the manner in which it does so "provides a focus for judicial review[.]" *Chaney*, 470 U.S. at 832. This distinction supports judicial review in this case, because, as noted *supra*, Better Markets is challenging not the DOJ's decision to take enforcement against JP Morgan, but the manner in which took that action.

particular remedy or remedies, a court must be chary of reading others into it"); *Slater*, 231 F.3d at 5 (same).[6]

The cases DOJ cites in support of its claimed "plenary power to settle claims of the United States," Mot. at 22-23, are also distinguishable. DOJ relies mainly on *Swift & Co. v. United States*, 276 U.S. 311 (1928), and *United States v. Hercules, Inc.*, 961 F.2d 796 (8th Cir. 1992). But *Swift* involved an antitrust consent decree entered in district court following the filing of a complaint against several large meatpacking companies. *Hercules* addressed a consent decree filed in district court resolving an environmental complaint brought by the United States. Thus, in those cases, the Executive Branch did what DOJ failed to do here: file a complaint setting forth the statutory violations and submit a settlement to the court for judicial review.

In short, there is a strong presumption of reviewability of agency action and, because FIRREA's sections 1833a(a) and (e) provide mandatory directives that DOJ must follow, this Court may and should review the DOJ's failure to follow them.

---

[6] DOJ's cases are distinguishable in another respect. They involved independent regulatory agencies charged by Congress with administering and enforcing complex regulatory schemes. Further, each agency had the statutory discretion to choose between exercising separate administrative enforcement authority or filing civil enforcement actions. *See NY State* (involving the FCC, with administrative enforcement authority under 47 U.S.C. § 503); *Irritated Residents* (involving EPA, with administrative enforcement authority under 42 U.S.C. §§ 7413(a)(1) & (a)(3), 9609, and 11045); *Baltimore Gas* (involving FERC, with administrative enforcement authority under 15 U.S.C. §§ 717t-1); *Schering* (involving FDA, with administrative enforcement authority under 21 U.S.C. § 334); *see also SEC v. Citigroup Global Markets, Inc.*, 2014 U.S. App. LEXIS 10516, at *29-30 (2d Cir. June 4, 2014) (noting that the SEC was "free to eschew the involvement of the courts and employ its own arsenal of [administrative] remedies instead"). Under these circumstances, courts generally afford agencies greater leeway in choosing the best "procedures . . . for implementing" the statutory schemes they administer. *Chaney*, 470 U.S. at 832. In contrast, DOJ is not responsible for administering the financial regulatory laws, it does not have separate administrative enforcement authority under those laws, and it does not have to determine how a given enforcement action "best fits the agency's overall [regulatory] policies." *Id.* at 831.

B.      This Court also has jurisdiction to hear Better Markets' constitutional claims.

This Court also has subject-matter jurisdiction over this case because Better Markets has alleged colorable claims that DOJ violated the separation of powers doctrine under the Constitution. Courts have jurisdiction to hear constitutional claims even where the claim challenges an agency action committed to discretion by law.

In *Webster v. Doe*, 486 U.S. 592 (1988), for example, the Supreme Court found that, under the National Security Act, the CIA Director's decisions to discharge employees were committed to the Director's discretion by law. *Id.* at 599-601. Nonetheless, the Court held that it could review the employee's claim that the termination violated the due process clause. *Id.* at 601-603 (so holding and noting that a "'serious constitutional question' . . . would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim."); *accord Doe v. Cheney*, 885 F.2d 898, 909 (D.C. Cir. 1989); *see also Hondros v. U.S. Civil Serv. Comm'n*, 720 F.2d 278, 293 (3d Cir. 1983) ("even those actions 'committed to agency discretion by law' are reviewable on grounds that . . . the decision violates any constitutional . . . command.") (internal citation omitted).

DOJ does not dispute this Court's jurisdiction to review constitutional claims but argues instead that Better Markets' separation of powers claim is not "colorable." Mot. at 32. However, as shown below, Better Markets alleges at least two colorable claims that DOJ violated the separation of powers doctrine: (1) by imposing a FIRREA civil penalty on JP Morgan without a court assessment, DOJ usurped for itself a power that Congress expressly gave to the judicial branch; and (2) entirely apart from FIRREA or any other statutory authority claimed by DOJ, by entering the Settlement without any judicial review and approval, DOJ ignored the inherent

authority and duty of federal courts to review settlements in extraordinary cases of far-reaching impact. DOJ thus avoided our system of checks and balances in two ways.

    1.    <u>The separation of powers doctrine preserves and protects the role of each branch of government, including the judicial branch.</u>

The doctrine of separation of powers exists "as a self-executing safeguard against the encroachment or aggrandizement of one branch at the expense of the other[,]" ultimately "to protect the liberty and security of the governed." *Metropolitan Wash. Airports Auth. v. Citizens for the Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 272-73 (1991), *superseded by statute as stated in Commonwealth v. Deep Dalal*, 39 Va. Cir. 91 (Va. Cir. 1996). "The purpose [of separation of powers is] not to avoid friction, but, by means of the inevitable friction incident to the distribution of the governmental powers among three departments, to save the people from autocracy." *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U.S. 579, 613-614, 629 (1952) (per Frankfurter, J., and also per Douglas, J., concurring). As Justice Frankfurter observed, "[t]he accretion of dangerous power does not come in a day. It does come, however slowly, from the generative force of unchecked disregard of the restrictions that fence in even the most disinterested assertion of authority." *Id.* at 594 (Frankfurter, J., concurring). This principle is especially compelling in a case such as this, where rather than being disinterested, DOJ had a motive to avoid judicial  review and public transparency, so that it could appear to be enforcing the law aggressively without subjecting its actions to meaningful scrutiny and evaluation. Compl. ¶¶ 13-22.

The separation of powers doctrine has a special role in safeguarding courts' role and authority. *See, e.g., Crowell v. Benson*, 285 U.S. 22 (1932) (holding that Congress may give adjudicatory power to administrative agencies only if Article III courts retain adequate control through judicial review). When Congress does allow an executive agency to have adjudicatory

authority, separation of powers requires "the functions of the adjunct must be limited in such a way that the essential attributes of judicial power are retained in the Art. III court." *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 81 (1982), *superseded by statute as stated in White v. Kubotek Corp.*, 2012 U.S. Dist. LEXIS 142247 (D. Mass. Oct. 2, 2012) (internal citations and quotations omitted); *see also id.* at 80-87 (finding statute at issue to have impermissibly removed most, if not all, of the essential attributes of the judicial power from Article III district courts, and to have vested those attributes in non-Article III bankruptcy courts).

In short, courts can and should safeguard the judiciary's proper role in our constitutional system. To protect that role, courts look at the "practical consequences [of a law or action] in light of the larger concerns that underlie Article III." *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 857 (1986); *see also Kucana v. Holder*, 558 U.S. 233, 237 (2010) ("Separation-of-powers concerns caution us against reading legislation, absent clear statement, to place in executive hands authority to remove cases from the Judiciary's domain."). Here, the "practical consequences" of DOJ's claimed authority are startling. Under DOJ's view, the Executive Branch has the authority to compromise **any** claims, for **any** potential illegalities, on **any** terms it sees fit, for **any** reason, without **any** review, transparency, or accountability— regardless of statutory constraints and regardless of the historic impact of its actions. The Constitution does not permit the exercise of such unbridled, unreviewable, and unilateral authority.

2.    Better Markets has pled a colorable claim that DOJ improperly usurped the power to assess penalties under FIRREA, something Congress reserved to the judicial branch.

Better Markets' first separation of powers claim is that, by imposing a FIRREA civil penalty on JP Morgan in an out-of-court Settlement, DOJ usurped for itself a power that Congress expressly gave to the judicial branch. Compl. ¶¶ 88-91.

DOJ, as a federal agency, has "power . . . no greater than that delegated to it by Congress." *Railway Labor Exec. Ass'n v. Nat'l Mediation Bd.*, 29 F.3d 655, 670 (D.C. Cir. 1994). Indeed, a federal agency such as DOJ does not enjoy "*plenary* authority to act within a given area simply because Congress has endowed it with *some* authority to act in that area." *Id.* (emphasis original); *see also State of Mich. v. EPA*, 268 F.3d 1075, 1081-1084 (D.C. Cir. 2001) (noting, "Were courts to *presume* a delegation of power absent an express *withholding* of such power, agencies would enjoy virtually limitless hegemony, a result . . . out of keeping . . . with the Constitution" and that a federal agency "has no constitutional or common law existence or authority, but only those authorities conferred upon it by Congress.") (internal quotation and citation omitted, emphasis original). Even when an agency seeks to act "in the public interest," it must do so pursuant to a "valid grant of authority from Congress." *FDA v. Brown & Williamson*, 529 U.S. 120, 161 (2000), *superseded by statute as discussed in Bullitt Fiscal Ct. v. Bullitt Cty. Bd. of Health*, 2014 Ky. LEXIS 237 (Ky. June 19, 2014); *see also id.* ("in our anxiety to effectuate the congressional purpose of protecting the public, we must take care not to extend the scope of the statute beyond the point where Congress intended it would stop.") (internal citations and quotations omitted).

Here, Congress did not delegate to DOJ the power to impose a FIRREA civil penalty on a private party. To the contrary, as explained in Section I *supra*, Congress required a *court* to

assess a civil penalty in a civil action commenced by the Attorney General under FIRREA. DOJ may not contract around this statutory requirement. *See Burnside-Ott Aviation Training Ctr. v. Dalton*, 107 F.3d 854, 858-859 (Fed. Cir. 1997) (holding a Navy contract could not waive review of disputes by the Board of Contract Appeals, as provided by statute); *see also Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 77 (1982) (courts generally will not enforce contractual bargains that violate a federal statute); *Journal of Commerce, Inc. v. U.S. Dep't of the Treas.*, 1988 U.S. Dist. LEXIS 17610, at *16-17 (D.D.C. Mar. 30, 1988) (finding void and unenforceable MOUs entered into between director of a division of U.S. Customs Service and private entity because they violated the Trade Secrets Act).

By entering the Settlement, DOJ exercised authority it did not have and supplanted the role Congress explicitly gave to the courts, a claim this Court has jurisdiction to hear under § 1331.

> 3.  <u>Better Markets also has pled a colorable claim that DOJ violated the separation of powers doctrine by failing to seek court involvement, entirely apart from any putative settlement authority DOJ may claim.</u>

Better Markets' second separation of powers claim is that, given the extraordinary, unprecedented nature of this case, DOJ had a duty to seek judicial review of the Settlement, regardless of whatever statutory authority DOJ may have claimed. Specifically, Better Markets alleges that this Settlement was so extraordinary in every material respect, that judicial review was essential to subject the Executive Branch to oversight and ultimately to ensure that the public interest was served. Compl. ¶¶ 92-98. A case of this magnitude and importance cannot be left exclusively to DOJ's unfettered discretion.

The proposition that courts must at times review and approve settlements in enforcement actions or private litigation is unremarkable. Often, judicial review is required by statute or rule.

*See, e.g.*, Section I *supra* re FIRREA (requiring court assessment of penalties, regardless of whether imposed after litigation or upon review of a settlement); Tunney Act, 15 U.S.C. § 16(e)(1) (consent decrees in antitrust actions must be published, submitted to court, and entered only upon a finding of public interest); Fed. R. Civ. P. 23 (class action settlements must be judicially approved); Fed. R. Civ. P. 66 (actions in which receivers have been appointed may only be dismissed by court order); *see also Citigroup Global Markets*, 2014 U.S. App. LEXIS 10516, at *30 (dereliction of court's duty not to review settlements where the court's injunctive power has been invoked).

However, such statutory or rule provisions are not necessary prerequisites to judicial review of settlements. Courts also have inherent authority to review settlements in cases that are extraordinarily complex and far-reaching in their impact on a large number of injured parties, an important industry, or the wider public interest. For example, in *In re Zyprexa Products Liability Litigation*, 433 F. Supp. 2d 268 (E.D.N.Y. 2006), a mass tort case, the court exercised its "equitable and inherent powers" to review a proposed settlement because of the extraordinary nature of the litigation, its far-reaching impact, the importance of the pharmaceutical industry, public health considerations, and the need to ensure that all litigants were treated fairly. *Id.* at 270-272. Courts also have used their equitable and inherent authority to restrict contingent fee agreements in non-class action cases, citing the "growing need to protect the public's trust in the judicial process." *In re Vioxx Prods. Liab. Litig.*, 574 F. Supp. 2d 606, 613 (E.D. La. 2008); *see also In re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig.*, 2008 U.S. Dist. LEXIS 17535, *62-65 (D. Minn. Mar. 7, 2008); *In re Zyprexa Prods. Liab. Litig.*, 424 F. Supp. 2d 488, 491 (E.D.N.Y. 2006) (multidistrict litigation transferee judges have restricted contingent fee agreements, treating such cases as quasi-class actions).

Courts are especially concerned with review of settlements in cases involving the public interest. *See Disability Law Ctr. v. Mass. Dep't of Corr.*, 960 F. Supp. 2d 271, 279-280 (D. Mass. 2012) (noting that the case was "a suit against the state brought on behalf of mentally ill individuals by an organization that is designated pursuant to federal law to protect their rights," and finding that the "nature of this case provides the court the discretion, **if not the duty**, to exercise its previously discussed inherent authority" to review the proposed settlement) (emphasis added); *Bragg v. Robertson*, 54 F. Supp. 2d 653, 662-663 (S.D. W. Va. 1999), *aff'd in part, rev'd in part sub nom. Bragg v. W. Va. Coal Ass'n*, 248 F.3d 275 (4th Cir. 2001) (finding that the court had authority to review settlement, where litigation was brought as a "citizen suit" with plaintiffs acting as surrogate attorneys general rather than an ordinary private litigant, and the litigation affected rights of people not explicitly parties to the suit and involved matters of great public interest).

As important as mass tort actions or citizen suits may be, this case presents what are, without question, among the most extraordinary circumstances in the history of government enforcement actions. Therefore, the principles set forth in the foregoing cases apply with even greater force here, and they require the DOJ to seek judicial review and approval of its settlement with JP Morgan. The Complaint sets forth the many factors that make the settlement unprecedented in its scope and importance. *See* ¶¶ 94-96. It is (1)  a record-setting monetary settlement; (2) involving the largest bank in the world, designated as a "systemically significant financial institution" under the historic 2010 financial reform law; (3) that purports to hold JP Morgan accountable for a course of egregious illegal conduct that contributed directly to the greatest financial calamity and economic disaster since the Great Depression, causing massive

harm to millions if not tens of millions of investors, homeowners, citizens, and taxpayers throughout the country, while enriching JP Morgan.

It further pleads that such an extraordinary settlement must be submitted to a court:

> Any enforcement action involving such an extraordinary combination of factors and having such a profound impact on the public interest, could not and should not be left for resolution to a settlement negotiated in secret between the Executive Branch and some of the same bankers who wrecked such devastation on our financial system and our entire economy.  Under these circumstances, the judiciary has a constitutionally assigned and protected role in safeguarding the public interest by adjudicating such claims, or overseeing any settlement the parties wish to enter in lieu of such adjudication.  Accordingly, by circumventing the judicial process and keeping the case outside the judiciary's constitutional domain, the DOJ violated the separation of powers doctrine.

*Id.* ¶ 98.

Better Markets' claim that the DOJ violated the separation of powers doctrine is at least colorable and accordingly the Court has jurisdiction to hear it.[4]

## II.   <u>BETTER MARKETS HAS ARTICLE III STANDING.</u>

On a motion to dismiss for lack of jurisdiction, the complaint's allegations should not only be assumed true, but also "construed favorably to the pleader." *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of the Treas.,* 2014 U.S. Dist. LEXIS 24885, at *7 (D.D.C. Feb. 27, 2014)

---

[4]   DOJ relies heavily on *United States v. Microsoft*, 56 F.3d 1448 (D.C. Cir. 1995), but that reliance is misplaced. First, that case involved a filed complaint and a consent decree brought to the district court for review and approval—precisely the critical steps that DOJ failed to take here. Second, while the appellate court in *Microsoft* held that the district court exceeded its authority by inquiring into certain aspects of the settlement, the gravamen of Better Markets' claim is that the Settlement was subjected to **no** judicial review. Third, the gaps in the Settlement here are significantly more serious than those at issue in *Microsoft*, and they include far more than merely an absence of information about the government's investigation or the negotiations, or even the lack of admissions. *See, e.g.,* Compl. ¶ 67. Finally, in *Microsoft*, the D.C. Circuit recognized that a district court need not accept a settlement or decree that "appears to make a mockery of judicial power." *Id.* at 1462. Here, the DOJ ignored judicial power altogether in derogation of federal law—FIRREA—and the Constitution.

(internal quotation and citation omitted). In addition, the "plaintiff must be given every favorable inference that may be drawn from the allegations of fact." *Id.*

With respect to standing specifically, "'general factual allegations of injury resulting from the defendant's conduct may suffice,' and the court 'presum[es] that general allegations embrace the specific facts that are necessary to support the claim[.]'" *Equal Rights Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1141 n.3 (D.C. Cir. 2011) (internal citations and quotations omitted); *see also Abigail Alliance for Better Access v. Von Eschenbach*, 469 F.3d 129, 132 (D.C. Cir. 2006) (same). The court also must "assume that on the merits the plaintiffs would be successful in their claims." *City of Waukesha v. EPA*, 320 F.3d 228, 235 (D.C. Cir. 2003). Here, then, the Court must assume that, by entering the Settlement without judicial review and approval, DOJ violated the separation of powers doctrine, FIRREA, and the APA's prohibition against arbitrary and capricious agency action.

Better Markets has pled the three essential elements of standing, including injury in fact that is concrete and actual or imminent, causation, and redressability. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Further, Better Markets has alleged three different types of standing: (1) organizational, (2) informational, and (3) procedural.

A.   Better Markets has suffered the type of legally cognizable injury recognized in *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982).

In *Havens*, a nonprofit organization dedicated to promoting equal access to housing challenged the racially discriminatory steering practices of a real estate leasing firm, which misrepresented the availability of rental units to minorities. The plaintiff alleged that, because of the defendants' steering practices, it had been "frustrated" in its efforts "to assist equal access to housing through counseling and other referral services" and was required "to devote significant resources to identify and counteract" the defendant's discriminatory practices. 455 U.S. at 379.

The Supreme Court had no hesitation in finding that the organizational plaintiff alleged cognizable injury. It held that, if the defendants' actions had "perceptibly impaired" the plaintiff's ability to pursue its organizational activities of counseling and referral services for those seeking housing, "there can be no question that the organization has suffered injury in fact." *Id.* The Court added that such "concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests[.]" *Id.*

The D.C. Circuit has applied *Havens* to find organizational standing "in a wide range of circumstances." *Abigail Alliance*, 469 F.3d at 133. It has clarified that *Havens* requires not only an impairment in an organization's ability to pursue its activities, but also a "direct conflict between the defendant's conduct and the organization's mission." *ASPCA v. Feld Entm't, Inc.*, 659 F.3d 13, 25 (D.C. Cir. 2011) (internal citation and quotation omitted). Further, a plaintiff cannot "manufacture the injury necessary to maintain a suit from its expenditure of resources on that very suit." *Spann v. Colonial Vill., Inc.*, 899 F.2d 24, 27 (D.C. Cir. 1990) (internal citations and quotations omitted).

As demonstrated below, the Complaint satisfies all of the foregoing requirements. The Complaint avers that (1) DOJ's conduct in entering the Settlement without judicial review directly conflicts with Better Markets' mission to promote transparency and accountability in the financial markets; (2) DOJ impaired Better Markets' ability to carry out its advocacy activities; and (3) Better Markets expended resources beyond those incurred in this lawsuit to "identify and counteract" the harmful impact of the Settlement, including efforts to correct   DOJ's misinformation campaign regarding the merits of the Settlement.

1.    <u>The Complaint alleges conflict with Better Markets' mission.</u>

The Complaint alleges that DOJ's unlawful actions conflict with the organization's mission objectives. It states that Better Markets "advocates for greater transparency, accountability, and oversight in the financial system[.]" Compl. ¶ 29. It also alleges more specifically that one of Better Markets' mission objectives is "promoting settlements in enforcement actions that are transparent, based on an adequate record, strong enough to punish and deter misconduct, and, at least under the extraordinary circumstances present in this case, subject to judicial review." *Id.* ¶ 103(a). As to conflict with mission, the Complaint alleges that "The $13 Billion Agreement has none of those attributes, and the DOJ's decision to enter the $13 Billion Agreement directly undermines Better Markets' mission." *Id.*

Other allegations further elucidate Better Markets' claim that the Settlement undermines transparency and accountability as to both the government and the financial industry. For example, the Complaint avers that DOJ and JP Morgan struck the bargain after a confidential investigation, followed by closed-door negotiations, and for the specific purpose of preventing the filing of a complaint that would have disclosed extensive detail regarding JP Morgan's allegedly illegal conduct. *Id.* ¶¶ 6, 13, 73-77. All of this was achieved without substantive public disclosure regarding even basic facts, such as the damage that JP Morgan inflicted, the ill-gotten gains it received, and the individuals responsible. *Id.* ¶¶ 8, 67. The Settlement documents and the accompanying DOJ press release present only the barest account of what JP Morgan did and how or why the settlement terms could be viewed as an appropriate response. *Id.* ¶¶ 8, 9. Thus, as alleged, the Settlement undermines Better Markets' basic mission objectives of increasing transparency in the financial markets and in the government's oversight of those markets.

The Complaint also avers that DOJ's Settlement undermines accountability as to both DOJ and JP Morgan. Because no independent judicial review took place, and because so little can be gleaned from the publicly available information about the Settlement, DOJ was able to strike the deal without any accountability or oversight. *Id.* ¶ 17. In addition, the Settlement raises questions about the extent to which, if at all, the Agreement actually holds JP Morgan accountable for what may be some of the most egregious and damaging securities fraud in the history of our financial markets. *Id.* ¶¶ 10, 67 (noting the information and potential remedies that are absent from the Settlement). Thus, as alleged, the Settlement also undermines Better Markets' goal of promoting accountability in the financial markets.

DOJ repeatedly asserts that Better Markets' "principal claim of injury is that the settlement 'conflicts' with its mission" and that this will not suffice for standing purposes. Mot. at 12, 13. But as detailed herein, the Complaint goes much further, alleging that DOJ's approach to the Settlement also has impaired Better Markets' ability to pursue its advocacy activities. *See Feld*, 659 F.3d at 27-28.[5]

> 2. The Complaint alleges impairment of Better Markets' ability to pursue its activities.

In addition to alleging conflict with mission, Better Markets also alleges the second element of organizational standing—impairment with Better Markets' ability to engage in its

---

[5] DOJ also argues that Better Markets is pursuing a "generalized grievance[]" that does not constitute actual injury. Mot. at 12. But standing is not lost simply because a plaintiff seeks to litigate issues that are of broad concern to the public. Otherwise, "the most injurious and widespread Government actions could be questioned by nobody." *United States v. Students Challenging Regulatory Agency Procedures*, 412 U.S. 669, 688 (1973). What is critical is that Better Markets has alleged specific, concrete injuries resulting from DOJ's actions, and thus has standing even if its concerns are widely shared. *See FEC v. Akins*, 524 U.S. 11, 24-25 (1998) (where a harm is concrete, though widely shared, the Court has found "injury in fact").

advocacy and educational activities. *See* Compl. ¶ 103(b); *see also Feld*, 659 F.3d at 25-26; *Equal Rights Ctr.*, 633 F.3d at 1140.

   a. <u>Lack of judicial assessment.</u> For example, the Complaint alleges that DOJ's decision not to seek judicial review and approval of the Settlement deprived Better Markets of a judicial assessment of the Agreement, a uniquely valuable tool for understanding the merits of any settlement, but especially one as complex and extraordinary as the one at issue here. As stated in the Complaint, "[t]here was no judicial determination regarding whether the $13 Billion Agreement should be approved and on what grounds. Such a culmination of the judicial review process is an irreplaceable diagnostic tool that Better Markets needs to advocate for strong enforcement of the law." Compl. ¶ 103(b)(i). The Complaint further alleges, "[w]ithout an independent, reliable, judicial assessment of the efficacy of DOJ's **current** enforcement efforts, including the settlement of potential claims as in the [Settlement], Better Markets is hampered in its ability to identify, and to advocate for, any necessary **changes** in the DOJ's substantive approach to enforcement." *Id.*

   b. <u>Lack of information that would be available in a complaint and related filings.</u> The Complaint further alleges that DOJ's decision not to seek judicial review and approval of the Settlement deprived Better Markets of the information that would have been publicly available from the judicial review process, including a complaint "setting forth the fraudulent conduct; the specific violations of law that resulted; the individuals responsible for those violations; and how those violations benefited JP Morgan Chase and harmed investors and other victims." Compl. ¶ 103(b)(ii). As further alleged, "Better Markets was also deprived of the inherent reliability of the proceedings in federal court, relative to a privately negotiated agreement." *Id.* Moreover, "the DOJ never had to justify or explain the terms of the $13 Billion

Agreement to a court, either in motions, supplemental filings, or at hearings convened by a court." *Id.* Without the foregoing information, "Better Markets cannot effectively identify weaknesses in the $13 Billion Agreement . . . and therefore cannot most effectively promote changes in the way our financial regulatory laws and rules are enforced." *Id.*

### c.   Inability to assess and correct misinformation.

Further, the Complaint avers that Better Markets is hampered in its ability to determine whether DOJ's bold claims about the Settlement as a means of holding Wall Street accountable are accurate, or are instead an effort to restore its reputation with claims that mislead the American public. The case law makes clear that, where a defendant's conduct creates a public misimpression that is antithetical to an advocacy organization's mission, that organization suffers *Havens* injury. *See Spann*, 899 F.2d at 28-29 (standing found where education program might be necessary to "rebut any public impression" that discrimination is permissible); *cf. Feld*, 659 F.3d at 26 (need to disseminate information to counter misimpression created by mistreatment of animals might have supported standing, but causation absent).

In this case, DOJ has succeeded in withholding so much information that Better Markets cannot assess the degree to which DOJ's portrayal of the Settlement is inaccurate. However, we know that some of the claims are misleading. For example, as detailed in the Complaint, the DOJ's statement that, as part of the Settlement, JP Morgan admitted making "serious misrepresentations" was false or misleading, as evidenced by JP Morgan's prompt and public denial of that characterization. Compl. ¶¶ 68-72. More generally, DOJ's claims about the impact of the Settlement are highly suspect. *Id.* ¶¶ 13-22, 67 (detailing gaps in Settlement). Thus, the injury to Better Markets includes not only the need to correct specific inaccurate portrayals of the Settlement, but also the need to combat much broader misinformation.

3.      The Complaint alleges that Better Markets has had to expend resources to counteract the harmful effects of DOJ's failure to seek judicial review and approval of the Settlement.

As alleged in the Complaint, because DOJ never sought any form of judicial review of the Settlement, Better Markets has been forced to expend resources to neutralize the harmful impact of DOJ's actions. That deployment of resources is still underway, Compl. ¶ 103(c), but so far has entailed "a public education and advocacy effort aimed at highlighting the lack of any judicial oversight or transparency in the settlement process," questioning whether the Settlement sufficiently punishes and deters JP Morgan, and attempting to correct at least some of the misinformation disseminated about the Settlement. *Id.*

For example, as a direct consequence of DOJ's actions, Better Markets was forced to expend resources advocating on its website and through the media, that because the Settlement had not been scrutinized by any court, DOJ should disclose vastly more information about it for the public's benefit; that the Settlement was not transparent; and that the Agreement may in fact have been lenient under the circumstances. *Id.* Moreover, DOJ's conduct has required Better Markets to question and to counteract what appears to be a misleading public relations campaign effectuated by DOJ in connection with the $13 Billion Agreement. *See* discussion *supra* regarding misleading portrayal of admissions. More generally, DOJ has publicly asserted that the Agreement in fact promotes accountability on Wall Street, without providing any credible basis for that claim. *Id.* Without judicial review, and the information that judicial review would generate, Better Markets must expend otherwise unnecessary resources to evaluate the Settlement and to counter the misinformation associated with it. *See Feld*, 659 F.3d at 26; *Spann*, 899 F.2d at 28-29.

DOJ points to some of the advocacy that Better Markets has pursued in connection with the Settlement and classifies all of it as "litigation expense" that cannot support standing under *Havens.* Mot. at 14. DOJ's list, however, does not accurately identify or characterize all of the ways in which Better Markets has channeled its resources to "identify and counteract" the pernicious effects of the Settlement. Many of the items to which DOJ refers predate the lawsuit and therefore cannot credibly be considered litigation expense, as DOJ attempts to do.

Moreover, the **post**-lawsuit advocacy of Better Markets must be differentiated from litigation expense. It cannot be true that any advocacy following a lawsuit constitutes litigation expense falling outside the scope of cognizable expenditures for standing purposes. If it did, then virtually no plaintiff could establish *Havens* standing, since the resource allocation necessary to "identify and counteract" the problem identified in the lawsuit would automatically be discounted as "litigation expense." Conversely, if the advocacy did not relate to the lawsuit, then it would be discounted as lacking a causal connection to the challenged conduct. DOJ's argument is untenable.

DOJ also suggests that Better Markets' claims of injury amount to an impermissible effort to convert "ordinary program cost—lobbying for their interests—into an injury in fact." Mot. at 15 (internal citation and quotation omitted). DOJ relies on a line of cases originating with *National Taxpayers Union, Inc. v. United States*, 68 F.3d 1428 (D.C. Cir. 1995), which held that a lobbying organization lacked *Havens* standing to challenge a new law increasing estate and gift tax rates.

*National Taxpayers* is, however, distinguishable. The plaintiff there failed to allege a critical standing element: the requisite "perceptible impairment." Rather, its principal claim of injury was that it had simply "expended resources to educate its members and others regarding

[the new tax law]." *Id.* at 1434. Here, by contrast, Better Markets advances at least three grounds, not present in *National Taxpayers,* to support its injury claim. First, it alleges that DOJ's illegal conduct directly conflicts with its mission. *See Feld*, 659 F.3d at 26-27 (distinguishing cases where plaintiffs failed to allege conflict with "stated mission"). Second, it alleges that DOJ's decision to avoid any judicial review and assessment of the Settlement impaired Better Markets' ability to advocate for strong enforcement of the financial laws. Third, Better Markets alleges that it must expend resources not just to struggle to evaluate the Settlement and to educate the public, but to counter the misimpression created by DOJ's insistence that the Settlement is an effective means of holding JP Morgan accountable and of deterring misconduct by other banks. Reallocating organizational resources to combat such misinformation is a form of injury that the D.C. Circuit has expressly acknowledged for standing purposes. *See Feld*, 659 F.3d at 26; *Spann,* 899 F.2d at 28-29.

To the extent DOJ suggests that injury to pure advocacy activities cannot support standing, the D.C. Circuit has questioned that view. In *Feld*, the D.C. Circuit closely examined the claim that injury solely to an organization's **advocacy** effort is insufficient under *Havens*. 659 F.3d at 29-31. While the court ultimately found standing absent due to a lack of causation, it expressed serious doubts that *Havens* standing requires anything more than an injury to pure advocacy activities. The court explained that the cases finding *Havens* standing involved activities that, although described in a variety of terms, were really advocacy at heart. Those activities "could just as easily be characterized as advocacy—and, indeed, sometimes are." *Id.* at 27. *Havens* does not preclude impairment of pure advocacy as a basis for organizational standing, and, in accordance with *Feld*, there is no principled basis for reading anything more into the *Havens* test. In sum, Better Markets has organizational standing under *Havens*.

B.      Better Markets has informational standing.

The Supreme Court has recognized a distinct form of standing where a plaintiff "fails to obtain information which must be publicly disclosed pursuant to a statute." *Akins*, 524 U.S. at 21 (internal citation and quotation omitted). The D.C. Circuit interprets *Akins* to hold that "a denial of access to information can work an 'injury in fact' for standing purposes, at least where a statute (on the claimants' reading) requires that the information 'be publicly disclosed' and there 'is no reason to doubt their claim that the information would help them.'" *Ethyl Corp. v. EPA*, 306 F.3d 1144, 1148 (D.C. Cir. 2002) (internal quotation and citation omitted); *see also Feld*, 659 F.3d at 23 ("plaintiff must espouse a view of the law under which the defendant . . . is obligated to disclose certain information that the plaintiff has a right to obtain").

Better Markets has alleged the elements of informational standing. Compl. ¶¶ 78-81; 83-85; 103(b). As discussed in Section I *supra*, FIRREA requires DOJ to file a public action in federal court when it seeks a monetary penalty. The information contained in any filings in any such action must be publicly disclosed, subject only to narrow exceptions. In fact, a presumptive, common law right of access applies to all judicial records and documents, based in part on the public interest in keeping "a watchful eye on the workings of public agencies." *Nixon v. Warner Commc'ns*, 435 U.S. 589, 597-98 (1978); *EEOC v. Nat'l Children's Ctr., Inc.*, 98 F.3d 1406, 1049 (D.C. Cir. 1996). The public nature of judicial filings and proceedings is also ensured through a number of government policies and rules. 28 C.F.R. § 50.9 (DOJ recognizes "a strong presumption against closing proceedings or portions thereof"); *see also* LCvR 5.1(h)(1) ("Absent statutory authority, no case or document may be sealed without an order from the Court.").[6]

---

[6] Even if the reviewing court were to seal some of the filings, Better Markets' injury still is redressable. *See Public Citizen*, 491 U.S. at 450-51 (although some information might be unavailable under Federal Advisory Committee Act, Court held appellants "might gain

By requiring DOJ to file an action in federal court with the attendant release of information to the public, FIRREA creates a statutory right to information that satisfies the *Akins* test. Contrary to DOJ's claim that Better Markets simply wants to know whether a violation occurred, Mot. at 15-16, the required public disclosures would include a broad range of information without which Better Markets cannot evaluate the Settlement, including a complaint detailing the alleged violations of law and the specific statutory authority being invoked by DOJ; submissions by the parties in support of any proposed settlement filed with the court; information about how the alleged violations benefited JP Morgan and harmed investors; and—of unique value—a judicial assessment of the Settlement. Those factors are among those that courts apply when assessing an appropriate penalty under FIRREA. *See Menendez*, 2013 U.S. Dist. LEXIS 39584, at *15-22. And they are essential for any determination by Better Markets as to whether the Settlement punishes and deters illegal conduct on Wall Street.

Further, there is "no reason to doubt," *Ethyl Corp.* at 1148, Better Markets' claim that the information would help its cause. On the contrary, the information that would become public if DOJ filed an action and subjected the Settlement to judicial review would remove critical impediments to the ability of Better Markets to understand how well the relief obtained redresses the misconduct that occurred, to identify weaknesses in the Settlement, to educate the public, to neutralize any misinformation disseminated in connection with the Settlement, and to effectively promote more effective law enforcement in our financial markets.

*Feld* supports this analysis. There, the D.C. Circuit **acknowledged** that the plaintiffs could have had informational standing if they had properly invoked the permitting provisions of

---

significant relief if they prevail" and those "potential gains are undoubtedly sufficient to give them standing.").

the Endangered Species Act, rather than simply pleading a violation of the prohibition against the "taking" of animals. 659 F.3d at 23; s*ee also Safari Club Int'l v. Salazar*, 281 F.R.D. 32, 41-42 (D.D.C. 2012) (finding that Section 10 supports informational standing and distinguishing *Feld*). Here, Better Markets alleges that DOJ violated FIRREA's informational provision requiring DOJ to file a public civil action when it seeks a monetary penalty. Compl. ¶ 103(b). That violation directly deprived Better Markets of the information that otherwise would have been available.

It is no defense to claim that FIRREA's main purpose is not informational. With the exception of purely informational statutes such as FOIA, most statutes invoked for informational standing will have some fundamentally non-informational goals. *Feld* illustrates the point. The statute at issue there—the Endangered Species Act—is aimed at protecting animals. Moreover, even the permitting process invoked by the plaintiffs there had non-informational purposes, in that it enabled the Secretary to condition exceptions to the "taking" prohibition for the benefit of animals, and allowed "interested parties to comment on and assist the Secretary's evaluation of permit applications[,]" 659 F.3d at 24. Yet, notwithstanding these non-informational goals, the court found the regulatory mechanism incorporated in the statute—the permitting process—sufficiently informational to support standing. *Id.*; *see also Ethyl Corp.*, 306 F.3d at 1148 (manufacturer of fuel additives had informational standing to challenge EPA decision to set emission standards without a rulemaking under the Clean Air Act, the purpose of which is to improve air quality). For the foregoing reasons, Better Markets has informational standing.

C.      Better Markets has procedural standing.

A plaintiff also has standing where it seeks "to enforce a procedural requirement the disregard of which could impair a separate concrete interest[.]" *Lujan*, 504 U.S. at 572; *City of*

*Dania Beach v. FAA*, 485 F.3d 1181, 1185 (D.C. Cir. 2007) (internal quotation and citation omitted); *see also Wildearth Guardians v. Jewell*, 738 F.3d 298, 305 (D.C. Cir. 2013) (procedure must be "tethered to some concrete interest adversely affected by the procedural deprivation"). That injury can arise directly, as it would if a plaintiff were deprived of a hearing before denial of a license application, or less directly, as it would if a federal agency failed to prepare an environmental impact statement and therefore failed to consider important factors before embarking on a project with significant environmental consequences. *Lujan*, 504 U.S. at 572.

Better Markets has both types of procedural standing. FIRREA imposes a procedural requirement on DOJ to pursue a civil action to obtain a monetary penalty. *See* Section I *supra.* DOJ ignored that obligation, resulting in two forms of concrete injury to Better Markets. First, it lost the opportunity to seek intervention or *amicus curiae* status to influence the process in court and the outcome of the judicial review. Contrary to DOJ's suggestion, Mot. at 17, Better Markets would have had a right to seek intervention, or *amicus* status which is routinely granted.  Better Markets has sought to participate as an *amicus* in 11 cases, and has obtained permission to submit a brief in every case, including four instances when a party objected.  Participation as an *amicus* can undoubtedly influence the disposition of the merits and the procedures followed in a case. For example, in *SEC v. Citigroup Global Markets, Inc.*, No. 11-cv-5227 (2d Cir. 2014), both parties appealed the lower court's rejection of their settlement. Better Markets sought an enhanced role as an *amicus* to defend the lower court's decision and thus fill the adversarial void. *See* Mot. of Better Markets, Inc. in *Citigroup Global Mkts.* (filed Feb. 15, 2012). Although the court declined to appoint Better Markets in that role, one month later, it directed the Clerk of the

Court to appoint independent pro bono counsel to defend the lower court's decision. Certified

Order, *Citigroup Global Markets* (filed Mar. 15, 2012).[7]

Second, and apart from any participatory rights Better Markets lost, DOJ's failure to

pursue a court proceeding prevented any independent consideration of the Settlement and its

impact on financial regulation and law enforcement. The resulting harm to Better Markets (in

addition to the lack of information otherwise available from the judicial record) is the inability to

to use the results of judicial review in evaluating the Settlement and designing appropriate

advocacy regarding the government's enforcement efforts against large banks.[8]

It is no obstacle to procedural standing that the outcome of the required procedure (filing

of a civil action and court review) cannot be predicted with certainty. Had the Settlement been

submitted for judicial review, Better Markets would at least have had the opportunity to seek

participation. *Cf. C C Distribs. Inc. v. U.S.*, 883 F.2d 146, 150 (D.C. Cir. 1989) (a "plaintiff

suffers a constitutionally cognizable injury by the loss of an opportunity to pursue a benefit . . .

even though the plaintiff may not be able to show that it was certain to receive that benefit had it

been accorded the lost opportunity"). Moreover, a judicial evaluation of the Settlement—either

pro or con—would have informed Better Markets' advocacy efforts in a significant and

---

[7] In addition, although the district court denied Better Markets' motion to intervene, it in fact rejected the proposed settlement agreement, as Better Markets had argued it should.

[8] The judicial review provision in FIRREA can also be viewed, at least in part, as "designed" to protect Better Markets' interests. Underlying any Congressional mandate for a judicial process is an intent to ensure judicial oversight and public transparency, goals that align with Better Markets' mission and activities. In addition, the judicial process necessarily creates the opportunity for parties with demonstrable interests in a case—such as Better Markets—to seek participation as an intervenor or *amicus*. *But see Center for Law & Educ. v. Dep't of Educ.,* 396 F.3d 1152, 1157 (D.C. Cir. 2005) (finding implementation procedures under No Child Left Behind Act were not "designed" to protect organization).

beneficial way. *See City of Dania Beach*, 485 F.3d at 1186 ("A plaintiff asserting procedural injury never has to prove that if he had received the procedure the substantive result would have been altered") (internal quotation and citation omitted).

        D.      <u>Imminence, causation, and redressability are also present.</u>

        Better Markets has already suffered "actual" injury as described above, and further injury is imminent judging from DOJ's repeated statements that it intends to follow the same approach to settlement in future cases. *See* Allie Jones, *It's Official: JPMorgan Owes the Justice Department $13 Billion*, Atlantic Monthly, The Wire, Nov. 19, 2013 ("Holder has made it clear that he's using the JP Morgan deal as a template to investigate at least nine other banks"); David Ingram & Aruna Viswanatha, *U.S. Plans New Bank Fraud Cases in Early 2014 – Attorney General*, Reuters, Dec. 4, 2013 (Holder describing the Settlement as "a template for the resolution of these other matters as they're brought"); Compl. ¶¶ 47(l); 103(e).

        Causation is also present, as DOJ apparently concedes by failing to address the issue. The impairment in Better Markets' ability to pursue its advocacy activities follows as a direct consequence of DOJ's unlawful decision to enter the Settlement without filing an action in court; without seeking court review and approval; without otherwise providing a complete and accurate account of the Settlement and its significance; and without affording Better Markets an opportunity to participate via intervention or an *amicus* role. *See Competitive Enter. Inst. v. NHTSA,* 901 F.2d 107, 122 (D.C. Cir. 1990) (plaintiff must assert "a plausible link between the agency's action, the informational injury, and the organization's activities."); *see also Action Alliance of Senior Citizens v. Heckler*, 789 F.2d 931, 937 (D.C. Cir. 1986) (challenged regulation restricted flow of information that group needed to pursue its activities combatting age discrimination).

Finally, redressability is also present, as alleged in the Complaint. *See* ¶ 44. Under D.C. Circuit law, something well short of "certainty" in the connection between the relief sought and amelioration of the harm will suffice. *Lepelletier v. FDIC*, 164 F.3d 37, 43 (D.C. Cir. 1999) ("the **possibility** of public disclosure, "though not a certainty, is sufficient to meet the redressability requirement.") (emphasis added); *Motor & Equip. Mfrs. Ass'n v. Nichols*, 142 F.3d 449, 457-58 (D.C. Cir. 1998) (holding that the **possibility** that the EPA would change its rules if the ones it had promulgated were vacated satisfied the redressability requirement because it gave the petitioner the opportunity of a favorable outcome in the new rulemaking) (emphasis added); *Safari Club Int'l v. Jewell*, 960 F. Supp. 2d 17, 53 (D.D.C. 2013) ("for the purposes of standing, these injuries could **conceivably** be redressed by this Court, for example, by a decision that the [Fish and Wildlife Service] needs to go back to the drawing board") (emphasis added).

In this case, if the Court awards the relief Better Markets seeks, it is likely and certainly conceivable that the harms will be redressed. Upon the filing of a complaint, and through the process of judicial review, Better Markets would receive the uniquely reliable information available from a filed complaint; the additional information flowing from other filings in support of the Settlement; and the judicial assessment of the Settlement. And Better Markets could seek to participate as intervenor or *amicus*.[9]

DOJ contends, however, that if the Settlement is cast into doubt through the declaratory judgment sought by Better Markets, then it is not certain whether DOJ would file a lawsuit; whether the parties would again reach a "meeting of the minds" and submit their agreement for

---

[9] Where deprivation of a statutory procedural right is alleged, "the courts relax—while not wholly eliminating—the issues of imminence and redressability[.]" *Center for Law & Educ.*, 396 F.3d at 1157 (citations omitted); *see also Lujan*, 504 U.S. at 573 n.7.

court approval; and whether Better Markets would be permitted to intervene or participate as an amicus. Mot. at 18-19.

First, as discussed above, this argument mischaracterizes the test, which does not require certainty. Furthermore, these contentions, while possible, are unrealistic. In *Abigail Alliance*, the D.C. Circuit held that an organization seeking access to experimental drugs for terminally ill members had standing to challenge FDA regulations that created obstacles to such access. As to redressability, the FDA argued that, even if it were required to change its regulations, it was mere speculation that the drug manufacturers would sell their experimental drugs to the plaintiff's members. 469 F.3d at 135. The Court rejected the argument, relying on the realistic expectation that "it would be in the drug companies' pecuniary interest to expand access to experimental drugs[.]" *Id.* The Court concluded that "[t]his makes the question of redressability a hardly-speculative exercise in naked capitalism[.]" *Id.*

Similarly here, DOJ has a pecuniary interest in pursuing its claims against JP Morgan, with billions of dollars at stake. DOJ, the Executive Branch, and Holder also have strong reputational and enforcement motives to pursue the case against JP Morgan. In fact, it is unlikely that the DOJ might simply walk away from its claims against JP Morgan, when all it need do is file the complaint that, according to DOJ was already prepared, present the Settlement to the court for review, and address whatever concerns the court may have, if any. Given the apparent enormity of the violations committed, the grievous harm done, and the DOJ's fanfare in announcing and taking credit for the Settlement, it would appear likely that the DOJ would file an action and seek judicial approval for the Settlement.

In sum, Better Markets has alleged three types of recognized standing.[10]

## III.   DISMISSAL UNDER RULE 19 IS UNWARRANTED.

DOJ argues that the other parties to the Settlement are indispensable under Fed. R. Civ. P. 19, and that, because those parties cannot be joined for lack of personal jurisdiction, the case must be dismissed. Mot. at 39-41. This argument fails for two reasons. First, pursuant to the "public rights" exception to Rule 19, neither JP Morgan nor the States must be joined. Second, even under a traditional Rule 19 analysis, DOJ failed to meet its burden of showing that JP Morgan and the States are either necessary or indispensable parties, and it is far from clear that they satisfy those tests under Rule 19.[11]

### A.   Under the public rights exception, JP Morgan and the States need not be joined.

In public interest litigation, where public rights are pursued, the principle of joinder of indispensable parties does not apply. *National Licorice Co. v. Nat'l Labor Relations Bd.*, 309 U.S. 350, 363 (1940). In *National Licorice*, the National Labor Relations Board ("NLRB")

---

[10]DOJ concedes two other issues by not raising them.  First, individuals and not just branches of government are protected by the separation of powers doctrine and may rely on that principle in otherwise justiciable cases. *See Bond v. United States,* 131 S. Ct. 2355, 2365 (2011). Second, Better Markets has prudential standing. *See Association of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970) (plaintiff has standing to seek judicial review under the APA when the interest asserted "is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question."). Better Markets is a "suitable challenger" to enforce FIRREA. *Western Wood Preservers Inst. v. McHugh*, 925 F. Supp. 2d 63, 73 (D.D.C. 2013). Better Markets' interests are fully aligned with FIRREA's statutory objectives, which include "enhanc[ing] regulatory powers and criminal justice provisions"; "restoring public confidence in the nation's financial system"; "protect[ing] the public interest"; "punish[ing] culpable individuals"; and preventing taxpayer-funded bailouts. *See* H Rep. No 101-54 Pt 1 (May 16, 1989) (HR 1278) at 465-66. Better Markets therefore falls well within the zone of interests.

[11] In addition, DOJ's argument that this Court lacks personal jurisdiction over the States should be viewed with skepticism. While Better Markets cannot know the facts surrounding the States' contacts with the District of Columbia, a natural inference is that the negotiations over the Settlement were centered here in D.C. and that JP Morgan as well as the States participated in those negotiations.

brought an enforcement action to bar an employer from enforcing labor contracts that violated the National Labor Relations Act. The Court held that the case need not be dismissed despite the failure of the NLRB to join the employees who were signatories to the contracts at issue: in a case focused on "the protection and enforcement of public rights, there is little scope or need for the traditional rules governing the joinder of parties in litigation determining private rights." *Id.* at 363.

The public rights doctrine has evolved to include cases where private parties assert public rights. *See, e.g., Natural Res. Def. Council, Inc. v. Berklund*, 458 F. Supp. 925, 933 (D.D.C. 1978); *see also National Wildlife Fed'n v. Burford*, 676 F. Supp. 271, 276 (D.D.C. 1985), *aff'd* 835 F.2d 305 (D.C. Cir. 1987), *rev'd on other grounds Lujan* (noting "courts have applied the exception even where disposition could harm the absent parties"); *Swomley v Watt*, 526 F. Supp. 1271, 1273 (D.D.C. 1981).

The rationale behind this exception to mandatory joinder of otherwise indispensable parties is that, by their very nature, public rights cases involve broad constitutional and statutory issues, which can implicate geographically dispersed entities with affected interests. Under such circumstances, joinder may be impracticable, if not impossible, because of the attendant jurisdictional limitations. *See Sierra Club v. Watt*, 608 F. Supp. 305, 324-25 (E.D. Cal. 1985). Strict adherence to the mandates of joinder would effectively preclude such public interest litigation. *Berklund*, 458 F. Supp. at 933. Rule 19 was not intended to preclude litigation against the government for failure to join indispensable parties, "and courts have not permitted it to do so." *Id.*

This case qualifies as public interest litigation, given the organizational status of Better Markets, the nature of the legal claims it is asserting, and the purpose of the action. Better

Markets is a 501(c)(3) tax exempt non-profit organization, established to advocate for the public interest in the financial markets. It alleges violations by DOJ under the Constitution and federal law. Its claims do not arise from the Settlement itself, and it does not seek relief against JP Morgan or any of the other parties to the Settlement. *See National Licorice*, 309 U.S. at 364 ("The rights asserted in the suit and those arising upon the contract are distinct and separate, so that a court may, in a proper case, proceed to judgment without joining other parties to the contract"). Finally, the purpose of this suit is not to advance Better Markets' pecuniary interests, but to promote and protect the public interest in transparent and accountable enforcement of the law in the financial markets. The public rights doctrine applies in this case, and the DOJ's claim for dismissal on lack of joinder grounds should be rejected.

B.      Even under a traditional Rule 19 analysis, dismissal would be inappropriate.

Even absent the public rights exception, dismissal is unwarranted. DOJ bears the burden of satisfying the tests for joinder. *Makah v. Verity*, 910 F2d 555, 558 (9th Cir. 1990); *see also* 2-12 MOORE'S FEDERAL PRACTICE—Civil § 12.35. But DOJ fails to show that any other person or entity is "required to be joined" under Rule 19(a)(1). And even if JP Morgan and the States were somehow deemed "required to be joined," DOJ has failed to show that they are indispensable under the four-factor test in Rule 19(b) (*e.g.* prejudice, protective measures, adequacy of judgment, and adequacy of relief for plaintiff upon dismissal). Nor is it clear that DOJ could establish any of these elements of Rule 19.

DOJ claims that under *Naartex Consulting Corp. v. Watt*, 722 F.2d 779, 788 (D.C. Cir. 1983), JP Morgan and the States must be joined simply because they are parties to the Settlement. Mot. at 39. However, *Naartex* is distinguishable because it was not a public rights case. *See Conner v. Burford*, 848 F.2d 1441, 1461, n.51 (9th Cir. 1988) (finding *Naartex*

inapplicable in a public rights case due to the private nature of the claim). In addition, the relief sought there was cancellation or **rescission** of a lease. In this case, Better Markets seeks an injunction preventing DOJ from enforcing the Settlement "**unless and until**" it is submitted to a court for review and approval. Compl. ¶ 130(b). Thus an order granting relief here will not necessarily destroy the benefits that the parties to the Settlement stand to gain, and ultimately, the Settlement may survive. In addition, if this Court requires the Settlement to be judicially reviewed, JP Morgan and the States can be heard in that proceeding in defense of the substance of the Settlement.  However, if the Court dismisses this case on joinder grounds, it appears Better Markets will have no alternative forum in which to litigate its "public rights" claim that the Settlement was entered in violation of the Constitution and federal law.

## <u>CONCLUSION</u>

For all of the foregoing reasons, the Court should deny DOJ's Motion to Dismiss. Alternatively, if the Court were inclined to dismiss the Complaint in whole or in part, it should do so without prejudice, so that Better Market may amend its Complaint and reassert its claims.

Respectfully submitted,

/s/Dennis M. Kelleher

Better Markets, Inc.
Dennis M. Kelleher
D.C. Bar No. 1009682
Stephen W. Hall
D.C. Bar No. 366892
1825 K Street, N.W., Suite 1080
Washington, D.C. 20006
Tel: 202-618-6464
Dkelleher@bettermarkets.com
Better Markets, Inc.
1825 K Street, N.W., Suite 1080
Washington, D.C. 20006

Dated:  July 7, 2014

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 7, 2014, a true and correct copy of the foregoing "Plaintiff's Memorandum of Points and Authorities in Opposition to Defendants' Motion to Dismiss," along with the accompanying proposed order, were filed with the Clerk of Court via the CM/ECF electronic filing system, causing them to be served on Defendants' counsel of record.

/s/ Dennis M. Kelleher
Dennis M. Kelleher
D.C. Bar No. 1009682
Better Markets, Inc.
1825 K Street, N.W., Suite 1080
Washington, D.C. 20006
Tel: 202-618-6464
Dkelleher@bettermarkets.com
